I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL POSTAGE PREPAID, TO ALL COUNSEL
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD IN THIS ACTION ON THIS DATE.

DATED: _____

_____
DEPUTY CLERK

FILED
CLERK, U.S. DISTRICT COURT

MAR 15 2000

CENTRAL DISTRICT OF CALIFORNIA
BY                           DEPUTY

NUNC PRO TUNC A/O 11-30-99

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 17 2000

CENTRAL DISTRICT OF CALIFORNIA
BY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE TURBODYNE TECHNOLOGIES, INC. SECURITIES LITIGATION, | ) CASE NO. CV 99-00697 MMM (BQRx)<br>)<br>) CLASS ACTION<br>)<br>)<br>) ORDER GRANTING DEFENDANTS'<br>) MOTION TO DISMISS<br>)<br>)<br>) |

This is a securities fraud class action brought against Turbodyne Technologies, Inc. and three of its officers and directors on behalf of all public investors who purchased Turbodyne securities between March 1, 1997 and January 22, 1999 (the "class period"). Turbodyne designs, develops, manufactures and markets products to enhance automotive engine performance.

Plaintiffs allege that defendants violated §§ 10(b)(5) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"), and Rule 10b-5 of the Securities and Exchange Commission ("SEC") regulations promulgated thereunder by making false and misleading statements concerning a variety of issues related to the company's development and expected release of a product known as the Turbopac. The Turbopac is an allegedly advanced form of turbocharger for internal combustion engines that uses microchip technology to boost airflow into the engine ... [This] product also allegedly increases the engine's fuel efficiency and reduces emissions.

Docketed

Copies / NTC Sent

JS-5 / JS-6-ND
JS-2 / JS-3
CLSD

MAR 17 2000

MAR 17 2000

77

Defendants have moved to dismiss the consolidated class action complaint on the basis that plaintiffs have failed to plead their claims with particularity as required by the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. Defendants argue that plaintiffs' allegations of reliance and scienter fail to satisfy the pleading standard established in the PSLRA. They also assert that the complaint fails to allege defendants' statements during the class period were knowingly false or misleading at the time they were made.

Plaintiffs counter that they have alleged facts demonstrating that Turbodyne trades in an efficient market, and thus that there is a presumption of reliance under a fraud-on-the-market theory. Additionally, they assert that they have satisfied the PSLRA's requirements regarding the pleading of scienter by alleging facts strongly supporting an inference that defendants consciously disregarded the truth in making the purportedly false statements. In this regard, they cite allegations in the complaint that incorporate pleadings filed in three state court actions involving Turbodyne.[1] These pleadings reference testimony and documents that, according to plaintiffs, indicate defendants knew their statements were misleading when they were made.

Although the Ninth Circuit has not itself defined the concept of an "efficient market," it has approved evaluation of the issue using the five factors suggested in *Cammer v. Bloom*, 711 F.Supp. 1264 (D.N.J. 1989). These include the stock's trading volume, whether securities analysts follow the stock, whether the stock has market makers and arbitrageurs, whether the company files a Form S-3 registration statement, and whether the empirical facts show a causal connection between corporate announcements and movement in stock price. Plaintiffs have adequately alleged two of the five factors — i.e., that Turbodyne's stock is followed by analysts

---

[1]The three cases are: (1) *Singleton v. Turbodyne Technologies, Inc.*, Los Angeles Superior Court Case No. LC047346, which was filed by a former corporate officer of Turbodyne on December 29, 1998, and alleges, *inter alia*, a claim for constructive discharge; (2) *Grand Tech, Inc. v. Turbodyne Technologies, Inc.*, Los Angeles Superior Court Case No. BS056312, which was filed by former Turbodyne distributor Grand Tech on March 24, 1999 to confirm an arbitration award in Grand's favor on a claim for negligent misrepresentation; and (3) *Turbodyne Technologies v. Manual P. Asensio*, Los Angeles Superior Court Case No. BC202422, which was filed on March 1, 1999, by Turbodyne against securities analyst Asensio. (See Complaint at 2.)

and that there is movement in the stock's price following corporate announcements.  While no court has apparently required that all five factors be pled in a securities fraud complaint before plaintiffs may rely on a fraud-on-the-market theory, the court believes that the pleading of only two of the factors is not sufficient to satisfy plaintiffs' burden of pleading reliance with particularity.

This failure to plead reliance requires that defendants' motion to dismiss be granted.  Because it is likely that plaintiffs will be able to cure this deficiency in their pleading, however, the court has also examined the sufficiency of their scienter allegations.  As interpreted by the Ninth Circuit, the PSLRA requires that plaintiffs plead in "great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *In re Silicon Graphics, Inc. Securities Litigation*, 183 F.3d 970, 974 (9th Cir. 1999).  This standard mandates that plaintiffs "show intent, as opposed to mere motive and opportunity." *Id.*  Additionally, plaintiffs must plead "adequate corroborating details." *Id.* at 985.

Here, plaintiffs have alleged that defendants made six different types of misrepresentations.  As explained in detail below, plaintiffs have adequately alleged that certain defendants made certain of the alleged misrepresentations with scienter.  As respects other defendants and other representations, however, the facts alleged do not give rise to a strong inference of conscious misconduct or deliberate recklessness as required by *Silicon Graphics*.  In amending the complaint, therefore, plaintiffs should address those areas in which the court finds their pleading of scienter deficient, or limit the alleged misrepresentations upon which they base their complaint to those concerning which scienter had been adequately alleged.[2]

---

[2]Because the court finds that plaintiffs have not pled reliance with particularity, and have failed adequately to allege scienter as respects certain of the defendants' purported misrepresentations, the court does not address defendants' additional arguments that plaintiffs have failed adequately to allege defendants' knowledge that the statements were false when made, or that the statements fall within the PSLRA's safe harbor for forward-looking statements or the parameters of the bespeaks caution doctrine.  In filing an amended complaint, the court recommends that plaintiffs group their allegations so that the pleading of each alleged misrepresentation is followed by allegations regarding falsity and scienter.  If this is done, the merits of these additional arguments, and the adequacy of plaintiffs' pleading, can more easily be

# I.  FACTUAL BACKGROUND

In deciding a motion to dismiss under Rule 12(b)(6), the court's review is limited to the contents of the complaint.  *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996).  All allegations of material fact must be taken as true and construed in the light most favorable to the non-moving party.  *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).  Accordingly, this statement of facts recites and accepts as true the allegations contained in the consolidated class action complaint.

The 93-page complaint alleges six categories of purported misrepresentations during the class period:

## A.    The Turbopac's Performance Capabilities

Plaintiffs allege that throughout the class period, defendants made a series of statements misrepresenting the performance capabilities and technical characteristics of the Turbopac.  These include that:

- Turbodyne's Form 20-F registration statement, filed with the SEC in September 1996, and signed by defendant Halimi, represented: (1) that the Turbopac employed a motor that "runs continuously"; (2) that the Turbopac was easy to install and could be installed by "unskilled mechanics";[3] and (3) that development of the Turbopac was "substantially complete."[4]

- Turbodyne's Form 20-F, filed December 10, 1996, again represented that the Turbopac motor "r[a]n continuously" and that it could easily be installed by "unskilled mechanics."[5]  The report also stated that the Turbopac's "specification

assessed.

[3]Complaint, ¶ 41.

[4]*Id.*, ¶ 43.

[5]*Id.*, ¶ 44.

1   and design [were] essentially complete."[6]

2   •     Turbodyne issued a press release on May 21, 1997 that claimed the Turbopac

3   "excel[led] at EPA air quality tests" and possessed the "unique capability of"

4   reducing diesel engine emissions.

5   •     Turbodyne's 1996 Form 20-F, filed July 29, 1997, claimed that it had "completed

6   development and commenced production of the 1500 Turbopac model."[7]  It also

7   stated that while Turbodyne had delivered a total of 210 Turbopacs to its

8   distributor, Grand Tech, Inc., Grand had not made any other significant purchases,

9   and would likely be unable to complete its purchase obligations under the parties'

10   distributorship agreement.[8]

11   •     On more than one occasion, Turbodyne referred to the Turbopac as "already-

12   proven" and as "breakthrough technology."[9]

13   •     In August and September 1997, Heavy Trucking Magazine reported claims by the

14   Turbodyne that the Turbopac "produced a 4 psi to 5 psi boost almost

15   instantaneously."[10]  A Turbodyne brochure "recommended" use of the Turbopac

16   with "engines [having] up to 8 liters of displacement," and claimed it was "capable

17   of supplying 12 lbs./min. of air at 4 psi of boost at sea level."[11]

18   •     Turbodyne's 1997 Annual Report, published in November 1998, claimed that the

19   company's products were "available now, today.  Our products are tried, tested and

---

21   [6]*Id.*

22   [7]*Id.*, ¶ 49.

23   [8]*Id.*, ¶ 50.  Representations regarding "completed development" and Grand's inability to
24   satisfy its obligations under the purchase agreement were made again in Turbodyne's 6-K filings
25   in August and September of 1997.  *Id.*, ¶¶ 53, 54.

26   [9]*Id.*, ¶¶ 57, 59.

27   [10]*Id.*, ¶ 60.

28   [11]*Id.*, ¶ 69.

true."[12]

- In an October 26, 1998 Wall Street Transcript interview, defendant Ware said that the Turbopac was "easy to install" and required no "additional equipment" to operate.[13]

Plaintiffs allege that these statements were materially false or misleading because defendants knew, or consciously and recklessly disregarded, that the Turbopac was "beset with design and operational problems that [made it] unable to perform the basic functions represented, unmarketable, and potentially dangerous."[14]  Plaintiffs further allege that Grand was not "unable" to fulfill its purchase obligations, but rather refused to accept delivery of additional Turbopacs because of the problems with them it had encountered.[15]  Finally, plaintiffs allege that the Turbopac was incapable of generating the represented level of boost, and that it could function only on vehicles with up to 2.0 liters of displacement.[16]

Plaintiffs assert that the true facts are "revealed in . . . pleadings and other documents publicly filed in connection with the Grand arbitration proceeding."[17]  As alleged in plaintiffs' complaint, these pleadings contain the following factual statements:

- Grand's trial brief asserts that in March 1997, "Grand reported to Turbodyne" that the Turbopac failed to operate "continuously."  It states that defendant Halimi disclosed he had put a "5 second governor on all of the units" because that was all

---

[12]*Id.*, ¶ 65.

[13]*Id.*, ¶ 68.

[14]*Id.*, ¶ 48.  Plaintiffs also allege that Grand had "report[ed] to Turbodyne" that the Turbopacs were unmarketable and dangerous.  *Id.*, ¶ 55.

[15]*Id.*, ¶ 52.

[16]*Id.*, ¶ 70.

[17]*Id.*, ¶ 71.

"that was needed for passing and acceleration."[18]  Grand's closing brief claims that during the arbitration, Halimi and a Turbodyne engineer testified that the Turbopac was "designed" not to run continuously.[19]  The arbitrator's award states that the Turbopac never ran for more than 8 seconds, and that the "Turbopac 1500 as produced did not perform as represented."[20]

- Grand's closing brief asserts that Halimi testified he knew the Turbopac had to be "installed by an expert" and required "specialized microchips."[21]

- Grand's trial brief contends that by March 1997, it had become aware that the Turbopac was not generating the promised amount of boost, and conveyed this information to Turbodyne.[22]  Further, the brief asserts that "independent evidence" proffered by Grand during the arbitration indicated that the Turbopac performed at 1.6, not 4, psi.  Thus, Grand argued that the Turbopac "deviated so far from the represented specification as to be unmarketable."[23]

- Grand's trial brief asserts that in 1997, it began to receive complaints from individuals who had received promotional Turbopacs that the units were shorting out and burning up.  Grand asserts it "reported th[e]se complaints to the defendants,"[24] and that in September 1997, Turbodyne reported that a "design flaw in the control panel was causing the units to burn."[25]  Grand maintains that despite

---

[18]*Id.*, ¶ 74.

[19]*Id.*, ¶ 75.

[20]*Id.*, ¶ 77.

[21]*Id.*, ¶ 80.

[22]*Id.*, ¶ 82.

[23]*Id.*, ¶ 82.

[24]*Id.*, ¶ 86.

[25]*Id.*, ¶ 87.

knowledge of the problem, Turbodyne did not take steps to correct it, and continued to manufacture the units.[26]

## B.   John Singleton's Involvement In Turbodyne's Operations

In February 1998, Turbodyne issued a press release naming John Singleton as its Chief Financial Officer.[27]  The release noted Singleton's superior qualifications and stated that he would serve as chairman of the company's Finance Committee and a member of its board of directors.[28]

In March and April 1998, Turbodyne issued a news release and filed documents with the SEC announcing Singleton's appointment as its Chief Operating Officer.[29]  The release stated that Singleton would, among other things, oversee the company's "finance and treasury,"[30] and again heralded Singleton's stature in the financial community.

On May 14, 1998, Turbodyne issued a news release, and shortly thereafter filed documents with the SEC, reporting the company's 1997 financial results.  The documents contained extensive quotations by Singleton concerning the company's revenue and growth.[31]  On May 22, 1998, defendants issued another release regarding financial performance that identified Singleton as the source of the information.[32]

Singleton's 1998 action against Turbodyne for constructive wrongful termination alleges that "news releases regarding the company's financial results were prepared and published without [his] authorization and involvement."[33]  The complaint asserts that although the company held

---

[26]*Id.*

[27]*Id.*, ¶ 140.

[28]*Id.*

[29]*Id.*, ¶ 141.

[30]*Id.*

[31]*Id.*, ¶ 142.

[32]*Id.*, ¶ 144.

[33]*Id.*, ¶143.

Singleton out as its CFO and COO, he was "denied the responsibilities and access to rudimentary information and resources [that are] customary [in] those positions."[34]  Singleton contends that he was thus unable to perform the functions of CFO/COO,[35] and that Turbodyne hired him only so that it could "us[e his] name and reputation for honesty and integrity to boost . . . industry, . . . financial community and . . . public [confidence] . . . in [the company]."[36]

### C.   Turbodyne's Alleged United Nations Endorsement

On April 11, 1997, defendants issued a news release stating that Turbodyne "had been recognized by the United Nations' Development Program (UNDP)."[37]  The release indicated that the Chief of the UNDP's "Global Technology Group," Joseph B. Den-Bak, had issued a letter of "designation" to Turbodyne.[38]  Turbodyne noted that such a designation was "significant," because it could "open[ ] up opportunities for Turbodyne to market products in countries that might not otherwise [be able to] afford [to buy its products]."[39]  The release stated:

> "Turbodyne has received interest from 57 developing countries for implementation of air quality improvement programs.  These programs can now be accelerated with the assistance of the United Nations Global Technology Group and other international organizations including funding from the World Bank, which is currently under consideration."[40]

Plaintiffs contend that defendants cited the company's "flag technology" status throughout the class

---

[34]*Id.*, ¶ 150.

[35]*Id.*

[36]*Id.*, ¶ 151.

[37]*Id.*, ¶ 123.

[38]*Id.*

[39]*Id.*

[40]*Id.*

period, including in a May 21, 1997 news release and a Form 6-K filed on July 22, 1997.[41]  In an October 21, 1997 news release, defendants discussed use of the Turbopac in "pilot programs" underway on three different continents, and noted that Turbodyne was participating in such programs in "cooperation [with] the United Nations Technology Group."[42]  In Turbodyne's 1997 Annual Report, the company claimed that its "United Nations Flag status [would] allow . . . countries [interested in purchasing the Turbopac] to seek World Bank assistance in funding programs to improve air quality."[43]

Plaintiffs contend these statements were materially false, citing an August 19, 1998 letter from the UNDP to Asensio & Co. in which the UNDP denied having bestowed flag status on Turbodyne or having endorsed its products in any way.[44]  Asensio subsequently issued a report captioned "Turbodyne's UN endorsements are blatantly false,"[45] in which it asserted that Ben-Dak had ended his term at the UN ten days before Turbodyne announced receipt of his endorsement.[46]  Asensio also reported that the UNDP Global Technology Group was no longer in existence, that Turbodyne's press releases regarding its flag status were not authorized by the UNDP, and that they did not accurately reflect the UNDP's position with respect to Turbodyne's products.[47]

On August 21, 1998, defendants issued a news release suggesting Asensio was a "short seller" that had an "ulterior motive" for publishing "blatant misinformation" about Turbodyne.[48]  The company defended its use of the UNDP designation, stating that Turbodyne had been granted

---

[41]*Id.*, ¶¶ 124-126.

[42]*Id.*, ¶ 127.

[43]*Id.*, ¶ 129.

[44]*Id.*, ¶ 132.

[45]*Id.*, ¶¶ 133, 134.

[46]*Id.*

[47]*Id.*

[48]*Id.*, ¶ 135.

flag status on March 14, 1997, before Ben-Dak left the UN, and after a "rigorous examination."[49]

### D. Turbodyne's Manufacturing Capabilities

According to Grand's Trial Brief, on December 31, 1996, Halimi sent a letter to Turbodyne shareholders and Grand stating that the company's manufacturing facility was "now fully operational and had the capacity to produce 8,000 Turbopacs per month."[50]  In various SEC filings during September and December 1996, Turbodyne asserted that development "of its products [was] substantially" and/or "essentially" complete.[51]

In 1997 SEC filings, Turbodyne reported that "production" of the Turbopac, "which [had] beg[u]n late [in 1996], *continue[d]*"[52] and that development was complete.[53]  A Form 6-K filed in September 1997 referenced delays in "full scale production" of the Turbopac, but allegedly "downplayed" their significance, reporting that they involved problems with warranties and manuals, not problems with the product itself.[54]

On March 30, 1998, Turbodyne issued a news release announcing that it had signed a three-year agreement with a Brazilian company, Asoria International, S.A., pursuant to which Asoria was to purchase at least 1,000 Turbopacs the first year, 5,000 the second and 25,000 the third.[55]  In April, Turbodyne announced that it had obtained a purchase order from an Italian company for forty Turbopacs.[56]  In May, a news release reported that "a major European . . . engine manufacturer" had designated Turbopac models 1500 and 2200 as standard equipment on

---

[49]*Id.*  Turbodyne has since initiated legal action against Asensio.  See note 1, *supra*.

[50]*Id.,* ¶ 96.

[51]*Id.,* ¶¶ 98, 99.

[52]*Id.,* ¶ 100.

[53]*Id.,* ¶ 101.

[54]*Id.*

[55]*Id.,* ¶ 103.

[56]*Id.,* ¶ 106.

three classes of engines "being manufactured for the 1999 model year."[57]

In June 1998, Turbodyne issued a news release regarding its first quarter 1998 financial results.  It reported that its outlook was strong as it "roll[ed]-out . . . new breakthrough technology on a global scale."[58]  Turbodyne's S-1 registration statement, filed September 23, 1998, claimed that the company had commenced commercial production of the Turbopac 1500 and 2500 models.[59]

Relying on evidence introduced during the Grand arbitration, the arbitrator's findings, and allegations set forth in Singleton's complaint, plaintiffs assert that these statements were misleading when made.  Specifically, they contend that Turbodyne did not have a large-scale manufacturing capability at any time prior to June 1998, that it had no Turbopac assembly line until Spring 1997, and that it was capable only of producing grossly defective and potentially dangerous units.[60]  Plaintiffs allege that during the Grand arbitration, Turbodyne employees testified that there was no assembly line operational until Spring 1997 and that thereafter, it produced only defective products.[61]  The arbitrator's findings confirm these facts.[62]

Further confirmation is found in Singleton's complaint, which asserts that he objected to defendants' representations regarding Turbodyne's "manufacturing capabilities" on several occasions prior to his resignation.[63]  Despite these objections, Singleton contends, defendants persisted in making the representations.[64]

---

[57]*Id.*, ¶ 107.

[58]*Id.*, ¶ 112.

[59]*Id.*, ¶ 113.

[60]*Id.*, ¶ 97.

[61]*Id.*, ¶ 115.

[62]*Id.*, ¶ 117.

[63]*Id.*, ¶ 118.

[64]*Id.*, ¶ 119.

### E.    The Multi-Million Dollar Russian Transaction

On June 22, 1998, Turbodyne issued a news release announcing that it had received a letter of intent from Trans Business Group ("TBG") in Moscow regarding the purchase of 10,500 Turbopacs beginning in the third quarter of 1998.[65] While cautioning that the purchase transaction was contingent on the "successful completion of financing arrangements with the US Export-Import Bank,"[66] the June 22 release stated that TBG would receive matching grants and consumer credit from sources such as the World Bank that would assist it in consummating the agreement.[67]

In a July 1998 release, Turbodyne announced that it had "formally accepted" TBG's order, and that the first shipment of Turbopacs would occur on October 1, 1998.[68]  In August, it stated that the TBG purchase order represented "more than $1 billion in potential sales to the company."[69]  Plaintiffs allege that these statements were misleading because defendants knew they did not have the manufacturing capability to fulfill such an order.[70]

The August 1998 release also announced that Turbodyne had established Turbodyne Credit Corporation for the purpose of "provid[ing] product financing guaranteed by world organizations for expanded sales to the Russian Federation."[71]  On October 2, 1998, defendants issued a release announcing that Turbodyne had received authorization to ship the first installation of Turbopacs to TBG.[72]  The release stated that "payment for the shipment [would] be through Direct Bank to

---

[65]*Id.*, ¶ 110.

[66]*Id.*, ¶ 163.

[67]*Id.*, ¶ 161.

[68]*Id.*

[69]*Id.*, ¶ 166.

[70]*Id.*, ¶ 111.

[71]*Id.*, ¶ 167.

[72]*Id.*, ¶ 170.

1  Bank Financing and [an] appropriate Export Credit Guaranty."[73]

2      Plaintiffs allege these statements were false because defendants knew, or were consciously

3  reckless in disregarding, that "no financing was in place for Turbodyne sales to [TBG]" and that,

4  as a consequence, no sales could be expected.[74]

5      On March 3, 1999, EASDAQ issued a news release in which it stated that, following an

6  investigation, it had ordered Turbodyne to "release complete and accurate information [regarding]

7  certain contracts and agreements."[75]  Simultaneously, Turbodyne issued a release indicating that

8  the TBG agreement was "subject to the completion of financing arrangements," and that it could

9  not "provide any assurance . . . the financing arrangements [would] be completed in the near

10  term."[76]

11  **F.    The Value Of Turbodyne's Technology**

12      Plaintiffs allege that defendants disseminated a series of statements during the class period

13  that misrepresented the value of the Turbopac technology.  Specifically, they assert that, on

14  January 20, 1998, Turbodyne issued a press release concerning its testing of the Turbopac, which

15  touted the product's "already-proven . . . engine performance capabilities" and "breakthrough

16  technology."[77]  Turbodyne used this same language to describe the Turbopac on other occasions

17  as well.[78]  At various times during the class period, defendants issued news releases and an

18  Annual Report that described the Turbopac as "breakthrough," "innovative," and "advanced

19

20

21

---

22  [73]*Id.*

23  [74]*Id.*, ¶ 171.

24
25  [75]*Id.*, ¶ 173

26  [76]*Id.*, ¶ 174.

27  [77]*Id.*, ¶ 57.

28  [78]See, e.g., *id.*, ¶¶ 59, 65.

1  technology."[79]  They further asserted that the Turbopac "establishe[d] a new paradigm."[80]

2        Plaintiffs allege these representations were materially false, as evidenced by the published

3  research reports of securities analyst Asensio & Co.[81]  One of these Asensio reports asserted that

4  the Turbopac was "merely a supercharger . . . driven by an electric motor instead of a belt" and

5  that it was "easy to duplicate."[82]  Another, issued on August 4, 1998, recommended selling

6  Turbodyne's stock because the company's managers had cultivated a "false perception" of

7  significant earnings "in order to defraud investors."[83]  The report stated:

8      "In the last five years, Turbodyne has claimed deals with 12 different companies

9      in over 14 different countries.  No manufacturer has ever incorporated a single

10      Turbodyne product in a new engine or vehicle."[84]

11  Approximately two weeks later, Asensio published another report stating that "Turbodyne

12  possesses no valuable technology . . . . Its alleged revolutionary product is easy to duplicate."[85]

13        Plaintiffs allege these reports demonstrate the material falsity of defendants' statements

14  regarding the value of the Turbopac technology.[86]  Additionally, they assert that defendants made

15  the statements knowing of their falsity or in "conscious reckless disregard" thereof, because

16  defendants continued to disseminate the information even after the Asensio reports were

17  published.  Indeed, plaintiffs note, Turbodyne argued that the analyst's reports were incorrect.[87]

18  ————————————

19  [79]*Id.*, ¶¶ 57, 60, 65, 90.

20  [80]*Id.*, ¶ 90.

21  [81]*Id.*, ¶ 91.

22  [82]*Id.*

23  [83]*Id.*, ¶ 92.

24  [84]*Id.*

25  [85]*Id.*, ¶ 93.

26  [86]*Id.*, ¶ 91.

27  [87]*Id.*

28

## II.  DISCUSSION

### A.   Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 1356 (1990).

A court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Johnson v. Knowles*, 113 F.3d 1114, 1117 (9th Cir. 1997); *Moore v. City of Costa Mesa*, 886 F.2d 260, 262 (9th Cir. 1989) (quoting *Conley*), cert. denied, 496 U.S. 906 (1990).  In other words, a Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988).

As noted above, in deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court's review is limited to the contents of the complaint.  *Campanelli*, *supra*, 100 F.3d at 1479; *Allarcom Pay Television, Ltd. v. General Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995).  The court must accept all factual allegations pleaded in the complaint as true, and must construe them and draw all reasonable inferences from them in favor of the nonmoving party.  *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir. 1995).  It need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.  *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981), cert. denied, 454 U.S. 1031 (1981).

Because Rule 12(b)(6) review is confined to the complaint, the court may not consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 102 F.3d 1524, 1537 (9th Cir. 1996).  It may, however, properly consider exhibits submitted with the complaint, documents whose contents are alleged in the complaint when their authenticity is not questioned,

16

and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1989); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), cert. denied, 114 S. Ct. 2704 (1994).[88]   The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998).

### B.   The Parties' Requests For Judicial Notice

Both parties have asked that the court take judicial notice of various documents, and both have objected to their opponent's request.   The court will address each party's objections in turn:

#### 1.   Plaintiffs' Objections

Plaintiffs object to defendants' request that the court take judicial notice of the report of securities analyst Yorktown Retail Group concerning Turbodyne.[89]   Because plaintiffs assert that the allegations in their complaint are based in part on a "thorough review" of "securities analyst reports," defendants urge that plaintiffs have incorporated all such reports by reference, and thus that the Yorktown Report is a proper subject of judicial notice. See, e.g., *Plevy v. Heggarty*, 38 F.Supp.2d 816, 821 (C.D.Cal. 1998) (taking judicial notice of analysts' reports cited or quoted in the complaint because their contents were "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").   Plaintiffs counter that the Yorktown Report is "outside" the complaint, and that defendants cannot rely on it as support for a motion to dismiss. See e.g., *Branch*, *supra*, 14 F.3d at 453 (a "document is not 'outside' the complaint if the complaint *specifically* refers to the document and if its authenticity is not questioned" (emphasis added)).

While plaintiffs' complaint pleads generally that it is based, *inter alia*, on a thorough

---

[88]Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

[89]See Declaration of Julie M. McEvilly In Support of Defendant's Motion to Dismiss Consolidated Class Action Complaint ("McEvilly Decl."), Ex. C.

review of "analysts' reports," plaintiffs identify only three specific analysts whose reports they reviewed — B. Riley & Co., CSK Securities and Fulcrum Securities.[90]  The complaint does not quote, cite or reference the Yorktown report.  See *Plevy, supra*, 38 F.Supp.2d at 821 ("all of these exhibits are cited, quoted from and/or referenced in the [complaint]").  For this reason, the court considers the Yorktown Report "outside" the complaint, and declines to take judicial notice of it.[91]

### 2.    Defendants' Objections

Defendants object to plaintiffs' request for judicial notice of Exhibits I-P and Exhibit Q.[92] Exhibits I-P are docket sheets and various pleadings from three state court actions filed against Turbodyne.  Plaintiffs' complaint relies heavily — at times, exclusively — on the allegations and evidence developed in these cases.  Exhibit Q contains information regarding the trading volume in Turbodyne shares, as well as the stock's price, during the class period.

### a.    Exhibits I-P

As respects the state court pleadings, defendants assert that the court may take judicial notice of the fact that they were filed, but not of the truth of the matter asserted therein.  See, e.g., *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1082, n. 6 (7th Cir. 1994) ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth [of the matter] asserted therein because these findings are disputable and usually are disputed"); *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384,

---

[90]Complaint, ¶¶ 184, 195.

[91]To hold otherwise would undermine the integrity of the *Branch* rule.  In addition to their allegations respecting analysts' reports, plaintiffs assert that the complaint is based on a review of relevant "news articles."  Very few such articles are identified in the complaint.  (See, e.g., Complaint, ¶ 60.)  Surely *Branch*'s requirement of specificity means that only those news articles that are quoted or cited, and not every news article that ever mentioned the company, may be considered.  Yet one would logically have to reach a contrary conclusion if one accepted defendants' argument respecting the Yorktown report.

[92]See Declaration of Tracy L. Thrower In Support of Plaintiff's Opposition To Defendant's Motion to Dismiss Consolidated Class Action Complaint ("Thrower Decl."), Exs. I-J and Q.

1388 (2d Cir. 1992) ("A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings'"). See also *Goetz v. Capital Factors, Inc.*, 120 F.3d 268, 1997 WL 415340, * 1-2 (9th Cir. 1997) (Unpub. Disp.) ("although a court may take judicial notice of its own records, it cannot take judicial notice of the truth of the contents of all documents found therein"). Consequently, defendants contend, taking judicial notice of Exhibits I-P would be inappropriate, since plaintiffs proffer the documents to prove the truth of the allegations contained therein.

Because defendants' objections were filed with their reply, plaintiffs did not have an opportunity to respond to them. Presumably, however, plaintiffs would argue that the court must consider the state court pleadings under the incorporation by reference doctrine because the documents are expressly incorporated into the allegations of the complaint.[93] The incorporation by reference doctrine permits a court to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *Branch, supra*, 14 F.3d at 454. See also *Silicon Graphics, supra*, 183 F.3d at 986 (holding that it was proper for the district court to consider SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint). Here, plaintiffs allege the contents of, and quote extensively from, briefs filed in the Grand arbitration and the complaint filed by Singleton. While defendants challenge the truth of the allegations set forth in these documents, they do not appear to challenge their authenticity. By incorporating the documents, plaintiffs have made the allegations their own, and they must thus be considered true for purposes of this motion to dismiss. See *Cahill, supra*. Accordingly, the court need not take judicial notice of the documents. Rather, it will consider the pleadings under the *Branch* incorporation by reference doctrine.

### b.    Exhibit Q

Defendants contend the court should decline to take judicial notice of Exhibit Q, which

---

[93]Complaint, ¶ 35.

contains information concerning the trading volume of Turbodyne's stock during the class period, because "plaintiffs are attempting to save their defective Complaint by asking this court to judicially notice matters which they failed to plead in their Complaint."[94]   Plaintiffs' complaint alleges much of the information contained in Exhibit Q, including Turbodyne's stock price on certain days and the dates the stock's upward and downward price swings began.[95]   The complaint lacks any allegations regarding Turbodyne's daily trading volume, however, and plaintiffs clearly seek to have the court take judicial notice of Exhibit Q to cure this omission.[96]   In deciding a motion to dismiss, courts may not "take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a)." *Schneider v. California Dept. of Corrections*, 151 F.3d 1194, 1197, n. 1 (9th Cir. 1998) (quoting 2 J. Moore et al., Moore's Federal Practice, § 12.34[2] (3d ed. 1997)).   The effect of plaintiffs' request that the court take judicial notice of Exhibit Q is the same, and the court declines to do so for that reason.

### C.   Legal Standards Governing Rule 10b-5 And Section 20(a)

#### 1.   Rule 10b-5

Rule 10b-5, promulgated by the SEC pursuant to § 10(b) of the 1934 Act, makes it unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b).   Specifically, one may not "(a) . . . employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) . . . engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any

---

[94]Defendants' Objection To Plaintiffs' Request for Judicial Notice In Support of Their Opposition To Defendants' Motion To Dismiss at 1:9-10.

[95]Complaint, ¶¶ 179-182.

[96]Pls.' Opp. at 25:4-5 ("the stock was heavily traded throughout most of the Class Period, with daily trading volume often exceeding 500,000 shares").

1    person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

2    The elements of a Rule 10b-5 violation are (1) the misrepresentation or omission of a

3    material fact, (2) reliance, (3) scienter, and (4) damages.  See *Paracor Finance, Inc. v. General*

4    *Electric Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) (en banc); *McCormick v. Fund*

5    *American Companies, Inc.*, 26 F.3d 869, 875 (9th Cir. 1994).  "Scienter" refers to "a mental state

6    embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S.

7    185, 193, n. 12 (1976).  While recklessness has long been held to constitute scienter (see *Nelson*

8    *v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978)), the Ninth Circuit has recently clarified that

9    recklessness "satisfies scienter under § 10(b)" only to the extent it "reflects some degree of

10   intentional or conscious misconduct." *Silicon Graphics, supra*, 183 F.3d at 977.[97]

11   **2.    Section 20(a)**

12   Section 20(a) of the 1934 Act provides:

13   "Every person who, directly or indirectly, controls any person liable under any

14   provision of this chapter or of any rule or regulation thereunder shall also be liable

15   jointly and severally with and to the same extent as such controlled person to any

16   person to whom such controlled person is liable, unless the controlling person acted

17   in good faith and did not directly or indirectly induce the act or acts constituting the

18   violation or cause of action." 15 U.S.C. § 78t(a).

19   A prima facie case of control person liability requires evidence (a) that a primary violation

20   of the securities laws occurred and (b) that defendant directly or indirectly controlled the person

21   or entity committing the primary violation.  See, e.g., *Paracor Finance, supra*, 96 F.3d at 1161.

22   Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the

23   alleged wrongdoing. *Id.* (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir.

24   1993)).[98]

25

26   [97]For a more complete discussion of the pleading of scienter following *Silicon Graphics*,

27   see Section II.E.2.a., *infra*.

28   [98]Defendants do not argue that the PSLRA heightened pleading requirements under § 20.

1    While the determination of control person status is an "intensely factual" question (*Paracor,*
2    *supra,* 96 F.3d at 1161(internal quotations omitted)), it is clear that a defendant's status as a
3    director of the corporate defendant is alone not enough to create a presumption of control.  See
4    *Arthur Children's Trust, supra,* 994 F.2d at 1396-97; *Lilley v. Charren,* 1996 WL 328243, * 6
5    (N.D.Cal. 1996).  Where plaintiffs limit their allegations to a narrowly defined group of corporate
6    officers who are "charged with the day-to-day operations of a public corporation," however, it
7    may be "reasonable to presume that these officers had the power to control or influence the
8    particular transactions giving rise to the securities violation," and to find that status alone is
9    sufficient.  *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1441 (9th Cir. 1987).  See also
10   *Arthur Children's Trust, supra,* 994 F.2d at 1397.

11   ### D.    Pleading Standards
12   #### 1.    Rule 9(b) Of The Federal Rules Of Civil Procedure
13   Rule 9(b) of the Federal Rules of Civil Procedure provides that "circumstances constituting
14   fraud or mistake shall be stated with particularity."  Fed.R.Civ.Proc. 9(b).  A securities fraud
15   claim cannot survive a motion to dismiss under this rule merely by identifying the allegedly
16   fraudulent statements.  *In Re Glenfed, Inc. Securities Litigation,* 42 F.3d 1541, 1548 (9th Cir.
17   1994) (en banc).  Rather, the complaint must allege "why the disputed statement was untrue or
18   misleading *when made."  Id.* at 1549 (emphasis added).  This requires that the plaintiff allege
19   inconsistent contemporaneous statements or information known to the defendants at the time the
20   statement was made that demonstrates its falsity.  *Id.* at 1548 ("our cases have consistently
21   required that circumstances indicating falseness be set forth").

22   #### 2.    The Private Securities Litigation Reform Act
23   In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4,
24   which amended the Securities Exchange Act of 1934.   The PSLRA modifies Rule 9(b)'s
25   particularity requirement, "providing that a securities fraud complaint shall identify: (1) each
26   statement alleged to have been misleading; (2) the reason or reasons why the statement is
27   misleading; and (3) all facts on which that belief is formed."  *Silicon Graphics, supra,* 183 F.3d
28   at 996; 15 U.S.C. § 78u-4(b)(1).  The statute mandates that in alleging scienter, a plaintiff "state

with particularity," as respects each allegedly misleading statement or omission, "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u- 4(b)(3)(A).[99]

The parties dispute the effect of the PSLRA on the traditional standards used to judge motions to dismiss under Rules 12(b)(6) and (9)(b) of the Federal Rules of Civil Procedure. Plaintiffs urge that the PSLRA "did not alter the standard by which courts evaluate Rule 12(b)(6) motions."[100] Defendants, by contrast, argue that the heightened pleading requirements established by the PSLRA make it harder for securities class action complaints to survive a motion to dismiss.[101]

The Ninth Circuit has already resolved this dispute in its recent decision in *Silicon Graphics*. As the court there indicated, in enacting the PSLRA, "Congress intended to elevate the pleading requirement[s]" that previously applied to securities fraud complaints. *Silicon Graphics*, *supra*, 183 F.3d at 974. Following the PSLRA, it is no longer sufficient to plead "facts showing simple recklessness or a motive to commit fraud and opportunity to do so." *Id*. Rather, "a private securities plaintiff proceeding under the PSLRA must plead in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id*. While the standard used in judging motions under Rule 12(b)(6) has not changed, therefore, it is clear that plaintiffs must meet the more stringent pleading requirements established by the statute to avoid

---

[99]The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without *actual* knowledge of their falsity. 15 U.S.C. §§ 77z-2(c), 78u-5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z-2(i), 78u-5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy*, *supra*, 38 F.Supp.2d at 830.

[100]Pls.' Opp. at 10:7-8.

[101]Defs.' Reply at 3-7.

1  dismissal.

2      **E.      Sufficiency Of The Complaint**

3          With respect to plaintiffs' claim under Rule 10b-5, defendants argue that the complaint fails

4  (1) to plead reliance adequately; (2) to plead scienter adequately; (3) to allege facts showing that

5  each representation was knowingly false when made; and (4) to allege facts demonstrating each

6  individual defendant's connection to the alleged misstatements.[102]   Additionally, defendants

7  _____

8          [102]Because the court finds that plaintiffs' allegations of reliance and scienter are deficient

9  in certain respects, it need not address defendants' arguments regarding the falsity of the
   representations or each defendant's connection to the alleged misstatements.  The court notes,

10  however, plaintiffs' contention that they have sufficiently alleged the individual defendants'

11  liability for the misstatements under the doctrine of "group pleading."  The "group pleading"
   doctrine creates a presumption that statements contained in "group-published information," such

12  as annual reports, news releases, prospectuses and registration statements, are the collective work
   of the individuals who control the day-to-day operations of the corporation.  See, e.g., *In re*

13  *GlenFed Inc. Securities Litigation,* 60 F.3d 591, 593 (9th Cir. 1993) ("In cases of corporate fraud
   where the false and misleading information is conveyed in . . . 'group-published information,'

14  it is reasonable to presume that these are the collective actions of the officers"); *In Re Stratosphere*

15  *Corporation Securities Litigation*, 1 F.Supp.2d 1096, 1108 (D.Nev. 1998).  The Ninth Circuit
   has not addressed whether the PSLRA's requirement that a plaintiff allege facts demonstrating

16  each individual defendant's scienter with particularity can be satisfied by invocation of the group

17  pleading doctrine, nor whether, following enactment of the PSLRA, the doctrine can be used to
   link individual defendants to the making of particular statements.   District courts that have

18  addressed the latter issue have reached opposite conclusions.  Some courts have held that "it is
   nonsensical to require that a plaintiff specifically allege facts regarding scienter as to each

19  defendant, [and then] allow him to rely on group pleading in asserting that the defendant made

20  the statement or omission." *Coates v. Heartland Wireless Communications, Inc.*, 26 F.Supp.2d
   910, 916 (N.D.Tex. 1998).   See also *Allison v. Brooktree Corp.*, 999 F.Supp. 1342, 1350

21  (S.D.Cal. 1998) ("To permit a judicial presumption as to particularity simply cannot be reconciled

22  with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by
   the defendant").  The majority view, however, appears to be that, absent direction from a higher

23  court, the group pleading doctrine survives the PSLRA.  See, e.g., *In re Oxford Health Plans,*
   *Inc.*, 187 F.R.D. 133, 142 (S.D.N.Y. 1999) ("This Court agrees that the PSLRA has not altered

24  the group pleading doctrine . . . ."); *Schlagel v. Learning Tree Int'l*, 1998 WL 1144581, * 5-6

25  (C.D.Cal. 1998) ("Until the Ninth Circuit speaks otherwise, the Court finds the rationale behind
   the group-pleading doctrine sound and will not disturb it"); *In re Miller Industries, Inc., Securities*

26  *Litigation*, 12 F.Supp.2d 1323, 1329 (N.D.Ga. 1998) (applying the "group pleading doctrine" post

27  PSLRA); *Stratosphere Corp., supra*, 1 F.Supp.2d at 1108 (refusing to hold "that group pleading
   has been sub silentio abolished by the PSLRA").  For purposes of the present motion, the court

28  need not resolve whether the group pleading doctrine remains a viable method of linking

1  contend that plaintiffs have not adequately alleged controller liability for purposes of their § 20(a)

2  claim.[103]

3           1.    **Allegations Of Reliance**

4           Reliance is an essential element of a Rule 10b-5 violation. See *Paracor Finance*, *supra*,

5  96 F.3d at 1157.   Rule 9(b) requires that reliance be pled with particularity.   See *In Re*

6  *NationsMart Corp. Securities Litigation*, 130 F.3d 309, 321-22 (8th Cir. 1997). Here, it is clear

7  that plaintiffs do not allege direct, personal reliance. Rather, they seek to plead reliance under

8

9

10  individual defendants to the making of particular alleged misrepresentations. It does conclude,
    however, that the doctrine cannot be used to establish that an individual defendant made an alleged
11  misrepresentation with scienter.   See, e.g., *In re Sunbeam Securities Litigation*, 1999 WL
12  1223604, * 12 (S.D.Fla. 1999) ("while the group pleading doctrine may satisfy . . . Rule 9(b)'s
    requirement of particularity, group pleading does not apply to the Reform Act[']s scienter
13  requirements").

14           [103]Given plaintiffs' failure to allege reliance and scienter adequately, the court need not
15  address their pleading of controller liability.  Since plaintiffs will undoubtedly file an amended
    complaint, however, the court makes the following observations regarding liability under § 20(a).
16  To state a controller liability claim, plaintiffs must plead a primary violation of the securities laws,
    and defendants' direct or indirect control of the person or entity committing the violation. See
17  *Paracor Finance, supra*, 96 F.3d at 1161. Because they have not adequately alleged reliance and
18  scienter, plaintiffs have not pled a "primary violation." Defendants contend plaintiffs have also
    failed to plead the second element of a § 20(a) claim, because they allege nothing more than that
19  the individual defendants were Turbodyne officers and directors. See, e.g., *Hemming v. Alfin*
20  *Fragrances*, 690 F.Supp. 239, 245 (S.D.N.Y. 1988) ("A person's status as an officer, director
    or shareholder, absent more, is not enough to trigger liability under § 20"). As noted above, the
21  Ninth Circuit has held that where "corporate officers are a narrowly defined group charged with
22  the day-to-day operations of a public corporation, it is reasonable to presume that these officers
    had the power to control or influence the particular transactions giving rise to the securities
23  violation." *Wool*, *supra*, 818 F.2d at 1441. See also *Lilley*, *supra*, 1996 WL 328243 at * 6
24  ("status alone may be sufficient when plaintiffs limit their fraud allegations to a narrowly-defined
    group of corporate officers"). Here, plaintiffs have named only Halimi, Nowek and Ware, whom
25  they identify respectively as Turbodyne's President and Chief Executive Officer, the Vice
    Chairman of its Board and Chief Financial Officer, and its Chief Operating Officer.  The
26  complaint clearly alleges that each of these defendants had the power and ability to, and did in
27  fact, control the contents of the company's annual and quarterly reports, its filings with the SEC,
    and its press releases. Assuming plaintiffs can plead a primary violation, therefore, they may well
28  have adequately alleged that the individual defendants controlled the corporation.

1    the fraud-on-the-market doctrine.[104]  See, e.g., *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42

2    (1988) (the fraud-on-the-market doctrine presumes that "in an open and developed securities

3    market, the price of a company's stock is determined by the available material information

4    regarding the company and its business. . . .  Misleading statements will therefore defraud

5    purchasers of stock even if the purchasers do not directly rely on the misstatements").  This

6    "presumption of reliance" is available only when plaintiffs allege that defendants made material

7    misrepresentations or omissions regarding a security actively traded in an "efficient market." *Id.*

8    at 247; *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999).  An "efficient market" is one

9    "where the stock prices reflect public information." *Binder*, *supra*, 184 F.3d at 1065.

10         In its most recent pronouncement regarding the fraud-on-the-market doctrine, the Ninth

11   Circuit noted that earlier circuit cases had not squarely addressed what constitutes an "efficient

12   market," and that the district court had thus used the five-factor test articulated in *Cammer v.*

13   *Bloom*, 711 F.Supp. 1264, 1286-87 (D.N.J. 1989) to evaluate the issue.   See *Binder*, *supra*, 184

14   F.3d at 1064.  While the Ninth Circuit did not explicitly endorse the *Cammer* test, it implicitly

15   approved it by affirming the district court's decision.  See *id.* at 1064-65.

16         *Cammer*'s five-factor test considers: (1) whether the stock trades at a high weekly volume;

17   (2) whether securities analysts follow and report on the stock; (3) whether the stock has market

18   makers and arbitrageurs; (4) whether the company is eligible to file an SEC registration Form S-3,

19   as opposed to Form S-1 or S-2; and (5) whether there are "empirical facts" showing causation

20   between corporate events or releases and an immediate response in the stock price.  *Id.* at 1065

21   (citing *Cammer*, *supra*, 711 F.Supp. at 1286-87).

22         Defendants contend that plaintiffs have alleged facts addressing only two of the five

23   *Cammer* factors, and that, "legally and factually," this is insufficient.  Plaintiffs counter that they

24   have adequately alleged most, if not all, of the factors discussed in *Cammer* and *Binder*.  They

25   note that *Binder* was a summary judgment case, and that neither *Binder* nor *Cammer* purported

26   to establish any minimum requirement for the pleading of an efficient market. See *Binder*, *supra*,

27   —————————————

28         [104]Pls.' Opp. at 24-25.

1 | 184 F.3d at 1065 (offering evidence as to only one factor — the presence of market makers and
2 | arbitrageurs — was not sufficient to survive summary judgment).

3 | While it is true that *Binder* did not set minimum requirements for pleading an efficient
4 | market, Rule 9(b) requires that reliance be pleaded with particularity. See, e.g., *NationsMart*,
5 | *supra*, 130 F.3d at 321. Applying Rule 9(b) standards to the pleading of reliance under a fraud-
6 | on-the-market theory, therefore, the complaint must state with particularity the facts upon which
7 | plaintiffs base their assertion that Turbodyne's stock traded in an efficient market. *Id.* at 322.

8 | Plaintiffs assert that they have specifically alleged four of the *Cammer* "factors" — that
9 | Turbodyne stock was actively traded on NASDAQ during the class period; that Turbodyne was
10 | actively followed by numerous analysts; that Turbodyne filed periodic reports with the SEC; and
11 | that the market promptly responded to both negative and positive news regarding the company.[105]
12 | As defendants note, however, only two of these allegations actually satisfy one of the *Cammer*
13 | factors. Neither the market on which a stock trades, nor the fact that a company "file[s] periodic
14 | reports with the SEC" is sufficient to show the existence of an efficient market. See *Harman v.*
15 | *LyphoMed, Inc.*, 122 F.R.D. 522, 525 (N.D.Ill. 1988) ("the inquiry in an individual case remains
16 | the development of the market for that stock, and not the location where the stock trades," cited
17 | in *Binder, supra*, 184 F.3d at 1065); *Cammer, supra*, 711 F.Supp. at 1287 (discussing the fact
18 | that "it would be helpful to allege the Company was entitled to file an S-3 Registration Statement
19 | in connection with public offerings or, if ineligible, such ineligibility was only because of timing
20 | factors rather than because the minimum stock requirements set forth in the instructions to Form
21 | S-3 were not met").

22 | As respects the remaining two factors — that analysts followed Turbodyne's stock and that
23 | the market responded to positive and negative news regarding the stock — defendants challenge
24 | the sufficiency of plaintiffs' allegations. Plaintiffs allege that during the class period at least three

25 |
26 | _____

27 | [105]*Id.* In their opposition, plaintiffs contend that Turbodyne's daily trading volume was high. Because this fact was not alleged in the complaint, however, the court cannot consider it
28 | in deciding defendants' motion to dismiss. See Section II.B.2.b., *supra*.

1    analysts followed the stock and issued reports thereon.[106]  While defendants urge that plaintiffs

2    must also allege when the reports were issued, what subjects they addressed, and the identity and

3    number of the analyst's customers, the relevant case law does not impose such a requirement.

4    Indeed, *Cammer* merely states that it is "persuasive to allege [that] a significant number of

5    securities analysts followed and reported on a company's stock during the class period." *Cammer*,

6    *supra*, 711 F.Supp. at 1286.  This plaintiffs have done.  They have also properly alleged facts

7    showing a cause and effect relationship between corporate announcements or events and the rise

8    and fall of the stock's price.[107]  Accordingly, the court concludes that plaintiffs have adequately

9    alleged these two *Cammer* factors.

10           While it is clear that satisfaction of only one *Cammer* factor is not sufficient as a matter

11   of law to prove the existence of an efficient market (see *Binder*, *supra*, 184 F.3d at 1065), it

12   appears no case has addressed how many *Cammer* factors must be alleged to plead reliance under

13   a fraud-on-the-market theory.  Reviewing plaintiffs' allegations in this case, the court concludes

14   that pleading two of the five factors is not sufficient to satisfy the particularity requirement of

15   Rule 9(b).  Plaintiffs have not only failed to plead a majority of the factors, but it is clear that "an

16   important factor weighing in favor of [a] finding" of efficient market is expressly alleged not to

17   exist.  The complaint clearly states that Turbodyne files a Form S-1, not a Form S-3, registration

18   statement.[108]  See *Cammer, supra*, 711 F.Supp. at 1285.

19           For these reasons, the court finds that plaintiffs have not alleged reliance under a fraud-on-

20   the-market theory with sufficient particularity, and defendants' motion to dismiss on this basis

21

22           [106]See, e.g., Complaint, ¶ 184 ("[a]t all relevant times, Turbodyne was followed by
     securities analysts employed by brokerage houses including B. Riley & Co., CSK Securities and
23   Fulcrum Securities, which issue reports and make recommendations concerning Turbodyne's
24   common stock to their clients").

25           [107]See Complaint, ¶¶ 177-182 (tracking the price of Turbodyne stock in relation to the
     various company announcements and third party reports).
26

27           [108]See Complaint, ¶ 113.  Assuming plaintiffs can plead additional *Cammer* factors, it is
     not clear that the fact Turbodyne files a Form S-1 *precludes* a finding that its stock trades in an
28   efficient market.

1   must be granted.[109]

2          2.      **Allegations Of Scienter**[110]

3                  a.      **Generally**

4          Defendants contend that plaintiffs have also failed adequately to plead intent to defraud.

5   In this regard, they cite *Silicon Graphics*, *supra*, which requires that plaintiffs plead "particular

6   facts giving rise to a strong inference of deliberate recklessness." *Silicon Graphics*, *supra*, 183

7   F.3d at 974.   This is done by alleging "in great detail, facts that constitute strong circumstantial

8   evidence of deliberately reckless or conscious misconduct." *Id.*  While "facts showing mere

9   recklessness or a motive to commit fraud and opportunity to do so may provide some reasonable

10  inference of intent," they are not alone sufficient to satisfy a plaintiff's pleading burden under the

11  PSLRA.  *Id.*  Rather, a complaint must allege "facts that come closer to demonstrating intent, as

12  opposed to mere motive and opportunity." *Id.*  Plaintiffs contend that, consistent with *Silicon*

13  *Graphics*, they have set forth particular facts demonstrating "at the very least . . . a strong

14  inference of deliberate recklessness."[111]

15         *Silicon Graphics* involved a securities fraud class action in which plaintiff alleged that a

16  corporation and its officers had made a series of misleading statements to inflate the value of the

17  company's stock while they engaged in insider trading.  *Id.* at 984.  The complaint alleged that,

18  despite their receipt of internal reports reflecting serious production and sales problems,

19  defendants made positive public statements regarding the company's performance that kept its

20  stock at artificially high prices.  *Id.*  While plaintiff asserted that defendants held meetings at

---

[109]It is possible that this pleading defect can be overcome, since it appears plaintiffs can plead that Turbodyne's stock traded at a high weekly volume.

[110]Plaintiffs' deficient pleading of reliance necessitates granting defendants' motion to dismiss.  Because it appears this deficiency can be corrected, however, and because it is likely defendants will move to dismiss any amended complaint that is filed, the court addresses defendants' arguments respecting the scienter allegations of the complaint in the interests of judicial efficiency.

[111]Pls.' Opp. at 22:14-16.

1  which they entered into this "conspiracy of silence," she provided no details to corroborate her

2  allegation. *Id.* at 985. The complaint contained no allegations regarding the contents of the

3  reports, nor any facts that "indicate[d] their reliability." *Id.* at 985. Additionally, it failed to

4  allege "the sources of [plaintiff's] information with respect to the [internal] reports, how she

5  learned of the reports, who drafted them, [and] which officers received them." *Id.* at 985. See

6  also *Heliotrope General, Inc. v. Ford Motor Company*, 189 F.3d 971, 979 (9th Cir. 1999)

7  (applying the *Silicon Graphics* standard).

8      In the absence of such information, the court stated, it could not "ascertain whether there

9  [was] any basis for the allegations that the officers had actual or constructive knowledge of [the

10 company's] problems [and] that . . . their optimistic representations to the contrary [were]

11 consciously misleading." *Id.* The court also found plaintiff's allegations regarding insider trading

12 deficient since they did not demonstrate that the stock sales were "dramatically out of line with

13 prior trading practices at times calculated to maximize the personal benefit from undisclosed

14 inside information." *Id.* at 986.

15      Here, plaintiffs allege the source of their information regarding the alleged

16 misrepresentations by identifying and incorporating various public documents (i.e., pleadings) that

17 purportedly show defendants knew their statements were misleading when made.[112] See, e.g.,

18 *Weiss v. Mentor Graphics Corp.*, 1999 WL 985141, * 6-7 (D.Or. 1999) (finding that a complaint

19 met PSLRA pleading standards because plaintiff alleged he knew defendants' representations were

20 false based on a conversation with one of its directors). Further analysis of the adequacy of

21 plaintiff's scienter allegations is complicated, however, by the fact that plaintiffs allege multiple

22 misrepresentations in six different categories, purportedly made by each defendant. In order to

23 determine whether plaintiffs have pled "adequate corroborating details" and "facts demonstrating,

24 at a minimum, a degree of recklessness that strongly suggests the required degree of intent"

25 (*Silicon Graphics*, *supra*, 183 F.3d at 985), the court must analyze the question of scienter

26

27      [112]Plaintiffs rely, for example, on the Grand pleadings, which contain allegations that

28 Grand *told* Turbodyne its products were ineffective, dangerous and not performing properly.

1    separately for each of the purported misrepresentations and each of the defendants.  See, e.g.,

2    *Sunbeam, supra*, 1999 WL 1223604 at * 12 (the Reform Act requires pleading "that each separate

3    defendant acted with scienter"); *In re Fine Host Corp. Securities Litigation*, 25 F.Supp.2d 61, 69-

4    71 (D.Conn. 1998) (analyzing scienter separately as to each defendant); 15 U.S.C. § 78u-4(b)(2)

5    (plaintiffs must "state with particularity facts giving rise to a strong inference that *the defendant*

6    acted with the required state of mind" (emphasis added)).  Cf. *Silicon Graphics, supra*, 183 F.3d

7    at 983, 985 (plaintiff's pleading was deficient, in part, because it did not allege which defendants

8    received internal reports reflecting serious production and sales problems).

9    b.    **Categories Of Misrepresentations**

10    i.    **The Turbopac's Performance Capabilities**

11    Plaintiffs allege that defendants knowingly misrepresented the Turbopac's performance

12    capabilities.  They assert that the Turbopac (1) could not operate continuously as promised;

13    (2) required expert installation, and was thus not "easy to install" as represented; (3) delivered

14    substantially less boost than represented; (4) could only operate in engines up to 2.0 liters of

15    displacement, not 8.0 as represented; (5) contained a design flaw that caused units to short out and

16    burn; and (6) contained a design flaw that caused units to drain engine batteries.[113]

17    As evidence that defendants made these misrepresentations with scienter, plaintiffs allege

18    that Grand's trial and closing briefs, as well as the arbitrator's award, confirm that Turbodyne

19    knew of these design flaws and characteristics, but nonetheless continued to misrepresent the

20    Turbopac's capabilities.  In order properly to assess whether these allegations are sufficient, it is

21    necessary to review the Grand pleadings on which plaintiffs rely.

22    •    Grand's trial brief recounts defendant Halimi's testimony that the Turbopac was

23        never designed to operate continuously and that it was equipped with a 5-second

24        "governor" that precluded continuous operation.[114]  These admissions by Halimi

25        give rise to a strong inference that he knew statements to the contrary were false

26

27    [113]Complaint, ¶¶ 74-89.

28    [114]*Id.*, ¶ 75.

31

1    or that he acted with deliberate recklessness in making such statements. Halimi's

2    knowledge or recklessness in this regard is imputed to Turbodyne.[115]   It is not

3    imputed to defendants Nowek and Ware, however, and the Grand brief,

4    incorporated into plaintiffs' complaint, does not support a similar inference that

5    they acted knowingly or with deliberate recklessness in making the allegedly false

6    statements.

7    •    According to the Grand arbitration filings, Halimi testified that, as early as 1996,

8         Turbodyne understood the Turbopac required expert installation and specialized

9         microchips to operate properly.[116]   As with his testimony regarding continuous

10        operation, this admission by Halimi is sufficient to support a strong inference that

11        he and Turbodyne acted with the requisite scienter in stating that the Turbopac was

12        "easy to install." Halimi's purported statement, however, does not give rise to a

13        similar inference respecting Nowek and Ware, and plaintiffs have not satisfied their

14        burden of pleading that these defendants made statements regarding the ease of

15        installation with the requisite scienter.

16   •    The Grand filings detail the fact that Grand told Turbodyne the Turbopac did not

17        deliver the advertised amount of boost, and that a Turbodyne engineer testified the

---

20   [115]See, e.g., *Wyle v. R.J. Reynolds Industries, Inc.*, 709 F.2d 585, 590 and n. 3 (9th Cir.

21   1983) (the knowledge of senior officers that statements are false is imputable to the corporation);

22   *W.R. Grace & Co., Inc. v. Western U.S. Industries, Inc.*, 608 F.2d 1214, 1218 (9th Cir. 1979)

     ("'It is a well settled principle that knowledge of officers and key employees of a corporation,

23   obtained while acting in the course of their employment and within the scope of their authority,

24   is imputed to the corporation itself'" (quoting *Acme Precision Products, Inc. v. American Alloys

     Corp.*, 422 F.2d 1395, 1398 (8th Cir. 1970)); *Sunbeam, supra*, 1999 WL 1223604 at * 12

25   ("knowledge of individuals who exercise substantial control over a corporation's affairs is properly

     imputable to the corporation"). Cf. *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435

26   (9th Cir. 1995) (the "cumulative knowledge" of officers and directors "will be imputed to the

27   corporation" (internal quotations omitted)).

28   [116]*Id.*, ¶¶ 78-80.

32

company had never been able to achieve this level in its product testing.[117]  Grand's closing brief states that Halimi admitted that Turbodyne "had frozen the design specifications at only 3 psi."[118]  Halimi's admission is sufficient to give rise to a strong inference that he knew statements that the Turbopac would deliver 4 to 5 pounds per square inch of boost were false or that he made such statements with deliberate recklessness.  While Halimi's knowledge may be imputed to Turbodyne, it may not be similarly imputed to defendants Nowek and Ware, and plaintiffs' allegations are insufficient to support an inference that they knew the statements regarding the amount of boost the Turbopac could deliver were false or that they made such statements with deliberate recklessness.

• Grand's closing brief asserts that Halimi and another Turbodyne employee testified that as early as the beginning of the class period, Turbodyne knew the Turbopac would not operate on engines with 8.0 liters of displacement.[119]  Halimi allegedly testified that, prior to June 1996, Turbodyne knew "the product was suitable only for small 4 cylinder engines."[120]  Halimi's testimony adequately supports a strong inference that he knew statements concerning the Turbopac's ability to work on engines with up to 8.0 liters of displacement were false or that he made such statements with deliberate recklessness.  While his knowledge and/or recklessness are imputed to Turbodyne, they are not similarly imputed to defendants Nowek and Ware.  As to these defendants, plaintiffs have not adequately pled scienter.

• Finally, filings in the Grand proceeding indicate that Turbodyne knew of major design defects in the Turbopac as early as Spring 1997, but failed to inform the

---

[117]*Id.*, ¶¶ 81-83.

[118]*Id.*, ¶ 83.

[119]*Id.*, ¶¶ 84-85.

[120]*Id.*, ¶ 85.

public of the problems, and continued to represent that it was prepared to begin large-scale product production.   Specifically, Grand's trial brief reports that Turbodyne engineers told Grand a design flaw in the control panel was causing units to burn.  The brief also states that of the twenty-nine Turbopacs delivered by Grand in the Summer of 1997, eight burned out by September.  Of these, one caused a fire in an automobile owned by a Taiwanese magazine publisher.  Halimi testified that he knew of this fire, and that it resulted from problems with the electronic control panel.[121]  Coupled with the remainder of the evidence detailed in Grand's brief, this admission supports a strong inference that defendants Turbodyne and Halimi knew by Summer 1997 that a large number of Turbopacs were shorting out and burning up.  No such inference can be drawn with respect to Nowek and Ware, however, and plaintiffs' pleading of these defendants' scienter is not sufficient as a result.

Halimi's admissions, as detailed above, indicate that he possessed information contrary to his public statements respecting various aspects of the Turbopac's performance.  These admissions are sufficient to give rise to a strong inference of deliberate recklessness or conscious misconduct on the part of Halimi and Turbodyne.  See, e.g., *Weiss*, *supra*, 1999 WL 985141 at * 6-7.  They do not, however, give rise to a similar inference as respects defendants Nowek and Ware, and the court finds that plaintiffs' pleading of these defendants' scienter does not satisfy the standard set forth in *Silicon Graphics*, *supra*, as respects alleged misrepresentations concerning the Turbopac's performance.

### ii.    John Singleton's Involvement In Turbodyne's Operations

Plaintiffs also allege that defendants misrepresented John Singleton's involvement in Turbodyne's operations as CFO and COO during the early half of 1998.  Plaintiffs' allegation that

---

[121]*Id.*, ¶¶ 86-87.  Plaintiffs also allege that the Grand filings demonstrate that defendants' knowledge of another design defect — that the Turbopac drained engine batteries.  Unlike other allegations regarding the Turbopac's shortcomings, Grand's brief does not disclose that Halimi or other Turbodyne employees admitted knowledge of this problem.

these representations were either consciously false or deliberately reckless rests on a complaint filed by Singleton against Turbodyne, Halimi, and Nowek asserting claims, *inter alia*, for breach of contract and tortious constructive discharge.[122]  Singleton alleges that Turbodyne, Halimi and Nowek denied him access to financial information and "deprived [him] of the ability to perform the functions of Chief Operating Officer and Chief Financial Officer."[123]  He further asserts that the "financial affairs of the corporation . . . were . . . conducted by Halimi, and others designated by him, in a manner which was intentionally designed to circumvent and exclude [Singleton]."[124]  Finally, he pleads that Halimi and Nowek "directed" preparation of Turbodyne's quarterly financial statement "without [his] knowledge, involvement or review."[125]  Singleton contends that, "[o]n several occasions," he "communicated to Halimi and Nowek that such continued . . . use of [his] name . . . was misleading, dishonest, and constituted violations of the securities laws."[126]

Plaintiffs assert that, as incorporated into their complaint, these allegations adequately plead scienter with respect to five purported misrepresentations.  The first two — a news release issued February 26, 1998, and a news release and Form 6-K issued on or about March 16, 1998 — merely announced Singleton's appointment as Turbodyne's Chief Financial Officer.[127]  None of the allegations in Singleton's complaint supports a strong inference that defendants made these statements with knowledge of their falsity or with deliberate recklessness.  At most, Singleton's allegations support a claim that, following his appointment, he was excluded from the financial

---

[122]Thrower Decl., Ex. P.

[123]*Id.* at ¶ 10; Complaint, ¶ 150.

[124]Thrower Decl., Ex. P, ¶ 10; Complaint, ¶ 150.

[125]Thrower Decl., Ex. P, ¶ 13; Complaint, ¶ 153.

[126]Thrower Decl., Ex. P, ¶ 15; Complaint, ¶ 154.

[127]Complaint, ¶¶ 140-141.

1  affairs of the company.[128]  Thus, as to the February 26 and March 16, 1998 statements, plaintiffs

2  have not adequately alleged scienter.

3        The same is not true of the other statements pleaded in the complaint.  Plaintiffs allege

4  (1) that Turbodyne filed a Form 6-K with the SEC on May 14, 1998 that quoted Singleton

5  extensively; (2) that on May 22, 1998, the company issued a news release regarding its financial

6  performance that identified Singleton as the source; and (3) that on June 24, 1998, Turbodyne

7  released its financial results for the quarter ending March 31, 1998.[129]  Singleton's complaint

8  asserts that during the period these representations were made (i.e., March through May 1998),

9  Halimi intentionally circumvented and excluded him from important aspects of Turbodyne's

10  financial affairs.[130]  He further asserts that Halimi and Nowek "directed" preparation of the March

11  31, 1998 quarterly financial statements and disseminated them to the public "without [his]

12  knowledge, involvement or review."[131]

13        These allegations give rise to a strong inference that Halimi and Nowek, and through them,

14  Turbodyne, knew that statements suggesting Singleton was actively involved in the company's

15  financial affairs were false, or that they were deliberately reckless in making such statements.

16  Accordingly, as to these defendants, scienter is adequately pled.  None of Singleton's allegations,

17  however, supports a strong inference that defendant Ware knew statements regarding Singleton

18  were false or that he acted with deliberate recklessness in disseminating them.  Consequently, as

19  to this defendant, scienter has not been adequately alleged.

20        **iii.**    **Turbodyne's Alleged United Nations Endorsement**

21        Plaintiffs next allege that Turbodyne misrepresented the fact that it had been awarded "UN

22

---

23      [128]Indeed, Singleton's complaint asserts that he grew concerned about his lack of access

24  to financial information "during the first three months of his employment."  See Thrower Decl.,
    Ex. P, ¶ 10.

25

26      [129]Complaint, ¶¶ 142-146.

27      [130]Thrower Decl., ¶ 10.

28      [131]*Id.*, ¶ 13; Complaint, ¶ 153.

Flag Technology Status."  They contend that, on multiple occasions between April 1997 and August 1998, Turbodyne publicized its recognition by the United Nations Development Program and its receipt of "assistance" from the United Nations in connection with the negotiation of potential international contracts and financing.[132]

To support their allegation that defendants knew these representations were false or that they made them with deliberate recklessness, plaintiffs cite an August 20, 1998 report by Asensio & Co.  The report asserted that the UNDP had not authorized Turbodyne's announcement that it had been accorded "UN Flag Technology" status, and that the company's news release in no way represented the UN's position regarding Turbodyne's technology or financing.  The report also noted that Joseph Ben-Dak, the UN official who had allegedly awarded Turbodyne Flag Technology status, had terminated his service with the organization ten days before Turbodyne's announcement.[133]

Plaintiffs also cite an August 19, 1998 letter sent to Asensio by Francois Lorio, the Chief of UNDP's Legal Section.  Lorio stated that Ben-Dak had left the UNDP on April 1, 1997, that the project portfolio and funding resources he had managed had been terminated, and that Turbodyne's technology "carrie[d] no endorsement on behalf of [the] UNDP."[134]

On August 26, 1998, Asensio published a second report stating that the UNDP denied any endorsement of Turbodyne.[135]  The report juxtaposed the fact that Ben-Dak left the UN on April 1, 1997 with Halimi's statement on August 17, 1998 that the two men had traveled to London and Moscow for negotiations regarding the Turbopac.  It further noted that Turbodyne's website continued to run an interview with Halimi in which he claimed the UN was "assisting"

---

[132]*Id.*, ¶¶ 123-131.

[133]*Id.*, ¶ 133.

[134]*Id.*, ¶ 135.

[135]*Id.*, ¶ 136.

1 | Turbodyne.[136]

2 | On August 21, 1998, Turbodyne released a statement asserting that it had been awarded

3 | Flag Technology status on March 14, 1997, before Ben-Dak left the UN.[137]  On December 16,

4 | 1998, it sued Asensio for defamation and disparagement in a complaint that did not allege that

5 | Asensio's statements regarding UN Flag Technology status were false.[138]

6 | Plaintiffs' allegations regarding the Asensio reports and Turbodyne's reaction to them

7 | support an inference that Turbodyne knew its statements concerning Flag Technology status were

8 | false. See *Sunbeam*, *supra*, 1999 WL 1223604 at * 9 (officers' denial of published reports that

9 | a company had engaged in improper accounting and financial reporting, together with their charge

10 | that the reports were "propaganda stirred up by 'shorts'" adequately pled scienter since the denial

11 | supported an inference that defendants were "either sufficiently familiar with the facts, or severely

12 | reckless in not being familiar, [that they were] in a position to issue a denial"); *Fugman v.*

13 | *Aprogenex, Inc.*, 961 F.Supp. 1190, 1195-96 (N.D.Ill. 1997) (finding that defendants'

14 | "statements mitigating the seriousness of their failure to complete the cell enrichment component

15 | of the GenSite system create a strong inference of scienter"); *Rehm v. Eagle Financial Corp.*, 954

16 | F.Supp. 1246, 1256 (N.D.Ill. 1997) ("defendant's attempts to mollify public doubt about [the

17 | corporation's] financial health by putting an optimistic and reassuring 'spin' on otherwise

18 | damaging [reports] show[ ] the defendants acted with knowledge").  Turbodyne's immediate

19 | denial of Asensio's allegations, coupled with its later decision not to allege that the analyst's

20 | reports regarding the UN relationship were libelous, constitutes circumstantial evidence sufficient

21 | to give rise to a strong inference that Turbodyne knew the statements were false or that it was

22 | deliberately reckless in making them.

23 | Further evidence of Turbodyne's alleged recklessness can be found in plaintiffs' allegations

24 | that Turbodyne failed to remove information regarding the UN arrangement from its website after

25 |

26 | [136]*Id.*

27 | [137]*Id.*, ¶ 135.

28 | [138]*Id.*, ¶ 138.

1 Asensio published its reports in August 1998, and that its 1997 Annual Report, issued in
2 November 1998, contained statements touting the company's Flag Technology status.[139] At a
3 minimum, the Asensio reports put Turbodyne on notice that it needed to investigate the true facts
4 concerning the UN relationship, and the company's continued reference to its Flag Technology
5 status months after those reports surfaced is sufficient to satisfy the "strong inference of deliberate
6 recklessness" standard. See *Sunbeam*, *supra*, 1999 WL 1223604 at * 15 (the fact that a corporate
7 officer "consciously ignored or recklessly disregarded . . . the public allegation of accounting
8 impropriety in the Barron's articles" constituted sufficient circumstantial evidence of scienter); *id.*
9 at 17 (the fact that an outside accounting firm did not "follow up" on allegations in Barron's of
10 manipulation of a company's interim financial statements was sufficient to support an inference
11 of "severe[ ] reckless[ness]"). Consequently, the court concludes that plaintiffs have adequately
12 alleged scienter as respects statements regarding the UN relationship.

13       The allegations are sufficient only as to Turbodyne and Halimi, however. Turbodyne's
14 August 17, 1998 release reported that Halimi traveled to London and Moscow with Ben-Dak, and
15 identified Ben-Dak as an UN official. Similarly, after the Asensio reports were published,
16 Turbodyne's website allegedly carried an audio interview with Halimi stating that the UN was
17 assisting Turbodyne.[140] These purported facts give rise to a strong inference that Halimi knew
18 the representations regarding Turbodyne's relationship with the UN were false, or that he was
19 deliberately reckless in permitting them to be made. Nothing in the complaint, however, supports
20 an inference, much less a strong one, that defendants Nowek and Ware made statements regarding
21 the UN endorsement with deliberate recklessness or knowledge of their falsity. Consequently,
22 while the court concludes that plaintiffs have adequately alleged that defendants Turbodyne and
23 Halimi made misrepresentations regarding Turbodyne's UN affiliation with scienter, they have
24 not pled facts giving rise to a strong inference that defendants Nowek and Ware acted with
25 scienter in making such representations.

26      ——————————

27     [139]*Id.*, ¶¶ 129-30.

28     [140]*Id.*, ¶¶ 131, 136.

1

### iv.   Turbodyne's Manufacturing Capabilities

2      Plaintiffs allege that on December 31, 1996, Halimi sent a letter to Turbodyne shareholders

3 and Grand claiming that Turbodyne's manufacturing facility was "now fully operational and had

4 the capacity to produce 8,000 Turbopacs per month."[141]  Additionally, plaintiffs allege that various

5 announcements made during 1997 and 1998 misrepresented that Turbodyne had the capability to

6 produce Turbopacs on a large scale.[142]

7      In support of their claim that defendants knew these statements were false, plaintiffs cite

8 the arbitration testimony of Turbodyne employees that the Turbopac assembly line did not go into

9 operation until Spring or early Summer 1997.[143]  This testimony was believed by the arbitrator,

10 who specifically found that a production line "was not put in operation until the spring of 1997."[144]

11 The arbitrator also found that, even then, the only Turbopacs that operated properly were

12 handmade prototypes "made before the production line was put in operation."[145]  Plaintiffs also

13 cite statements in the Grand trial brief that throughout the fall of 1996, Halimi assured Grand that

14 Turbodyne was on the verge of beginning production, that he blamed production delays on

15 Turbodyne's parts suppliers, and that product delivery dates were unilaterally extended several

16 times.[146]  As further support for their claim that statements regarding production capability were

17 made with scienter, plaintiffs cite Singleton's allegations that he demanded defendants stop

18 misrepresenting Turbodyne's manufacturing capacity before he resigned in June 1998.[147]

19

20 _____

21     [141]*Id.*, ¶ 96.

22     [142]*Id.*, ¶¶ 98-113.

23     [143]*Id.*, ¶ 115.  Plaintiffs allege that even after the assembly line became operational, it
produced grossly and dangerously defective products.  *Id.*

24

25     [144]*Id.*, ¶ 117.

26     [145]*Id.*

27     [146]*Id.*, ¶ 116.

28     [147]*Id.*, ¶ 118.

1    Assuming the truth of these allegations, they demonstrate that Turbodyne did not have

2  substantial manufacturing capacity at any point between 1996 and mid-1998.   Given the

3  significance of the Turbopac to the company's operations,[148] a strong inference can be drawn that

4  the president and chief executive officer, the chief operating officer, and the chief financial officer

5  knew the true facts respecting the company's manufacturing capacity.  See, e.g., *Danis v. USN*

6  *Communications*, 73 F.Supp.2d 923, 938-39 (N.D.Ill. 1999) ("'[F]acts critical to a business's core

7  operations . . . generally are so apparent that their knowledge may be attributed to the company

8  and its key officers,'" quoting *Epstein v. Itron, Inc.*, 993 F.Supp. 1314, 1326  (E.D.Wash.

9  1998)); *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 232 (D.Mass. 1999) ("As a matter

10  of law, . . . courts have held that certain information, particularly 'facts critical to . . . an

11  important transaction[,] generally are so apparent that their knowledge may be attributed to the

12  company and its key officers'"); *In re Aetna Inc. Securities Litigation*, 34 F.Supp.2d 935, 953

13  (E.D.Pa. 1999) (finding strong circumstantial evidence of individual defendants' scienter where

14  the alleged fraud related to the corporation's "core business" during the time period in which the

15  defendants ran the corporation); *Schlagel, supra*, 1998 WL 1144581 at * 18 ("facts critical to a

16  business's core operations or an important transaction generally are so apparent that their

17  knowledge may be attributed to the company and its key officers" (internal quotations omitted));

18  *In re Ancor Communications, Inc.*, 22 F.Supp.2d 999, 1005 (D.Minn. 1998) (knowledge of facts

19  related to company's $30 million contract could be imputed to its officers and gave rise to a strong

20  inference of scienter).  Specifically, it can be inferred that individuals in such key management

21  positions as those allegedly held by the individual defendants must have known so basic a fact as

22  whether the company's production line was up and running.  The officers' knowledge on this

23  score may be imputed to Turbodyne.  See *Wyle, supra*, 709 F.2d at 590.  Thus, to the extent that

24  misrepresentations regarding production capability — or predictions of future production capability

25  — can serve as a basis for liability, plaintiffs have adequately alleged both Turbodyne's and the

26

27  _____

28    [148]See *id.*, ¶¶ 34, 36 (the Turbopac was Turbodyne's "core engine technology product").

1  individual defendants' scienter.[149]

2                    **v.    The Multi-Million Dollar Russian Transaction**

3          Plaintiffs allege that defendants misrepresented two distinct aspects of the Russian

4  transaction. First, they cite Turbodyne's news release announcing that it had "formally accepted"

5  an order from TBG for the purchase of 10,500 Turbopacs and that the first delivery would be

6  shipped on October 1, 1998.[150]   Plaintiffs allege these statements were misleading because

7  defendants knew they did not have the manufacturing capability to fulfill the order.[151]   As

8  discussed above, plaintiffs have adequately alleged defendants' scienter with respect to statements

9  regarding Turbodyne's manufacturing capacity.  Thus, to the extent that Turbodyne's statements

10  regarding the TBG sale can be seen as misrepresenting the company's production capabilities,

11  plaintiffs have properly alleged scienter.

12          Additionally, plaintiffs assert that defendants more generally misrepresented the likelihood

13  of financing for — and thus the completion of — the TBG sale.  They contend defendants made

14  six misrepresentations regarding the financing of the transaction:

15      •    Turbodyne's 1997 Annual Report, issued in November 1998, stated that its Flag

16           Technology status would allow countries interested in purchasing the Turbopac as

17           a means of improving air quality to seek World Bank financing assistance.[152]

18      •    On June 22, 1998, defendants issued a press release indicating that Turbodyne had

19           "received the official Export-Import Bank of the United States 'Letter of Interest

20           No. L10783628XX - Russia,' dated June 18, 1998, for funding of an expected

21  _____

22          [149]While plaintiffs have adequately alleged scienter, they may wish to consider whether
they can establish the actual falsity of several of the alleged statements regarding manufacturing
23  capability.  It is not immediately apparent, for example, how the evidence adduced during the
Grand arbitration establishes the falsity of Turbodyne's May 1998 announcement that it had
24  shipped Turbopac "bus kits" to the Detroit Diesel Company.
25

26          [150]Complaint, ¶ 110.

27          [151]*Id.*, ¶ 111.

28          [152]*Id.*, ¶¶ 65, 129-30.

purchase order of $30,675,000.00 from Trans Business Group of Moscow, Russia."
The release noted that TBG had issued a Letter of Intent for the purchase of 10,500
Turbopacs, with delivery to commence in the third quarter of 1998,[153] and quoted
Halimi as stating that TBG would "benefit from matching grants and consumer
credit, which [were] available from several sources, including the World Bank for
Environmental Programs."[154]  The release cautioned that the sale was contingent on
the "successful completion of financing agreements with the US Export-Import
Bank."[155]

- On July 2, 1998, Turbodyne issued a second news release stating that TBG had
  submitted a purchase order for Turbopacs, which had been "formally accepted and
  confirmed" by Turbodyne.[156]  The release noted the statement in the "purchase
  order . . . that all financing arrangements [were] expected to be finalized 30 days
  prior to the first shipment date,"[157] and quoted Halimi's comment that "users of
  Turbodyne technology [were] candidates for several grants and funding assistance
  from various organizations, including the World Bank."[158]

- On August 17, 1998, Turbodyne issued a press release announcing that it had
  created a credit financing subsidiary to facilitate the TBG transaction.   Halimi
  stated that "Turbodyne Credit Corporation" would "provide product financing
  guaranteed by world organizations for expanded sales to the Russian Federation,

---

[153]*Id.*, ¶ 161.

[154]*Id.*

[155]*Id.*

[156]*Id.*, ¶ 164.

[157]*Id.*

[158]*Id.*

as well as to other export markets."[159]  Approximately two months later, Turbodyne announced that "Turbodyne Credit Corporation" had "commenced operations."[160]

- On October 2, 1998, Turbodyne announced that it had received its first "shipment order" for Turbopacs from TBG, and that "[p]ayment for the shipment will be through Direct Bank to Bank Financing and appropriate Export Credit Guaranty."[161]

- Finally, Turbodyne's Form 10-Q for the period September to November 1998 stated that "the first shipment to [TBG] currently is anticipated to begin in the fourth fiscal quarter of 1998."[162]

Plaintiffs allege these statements were false because defendants knew or were consciously reckless in disregarding that "no financing was in place for Turbodyne sales to [TBG]" and thus that no sales could be expected.[163]  Plaintiffs base their allegation of scienter on a March 3, 1999 EASDAQ release which stated that, following an investigation, the exchange had ordered Turbodyne to "release complete and accurate information on certain contracts and agreements."[164] Simultaneously, Turbodyne issued a release stating that the TBG deal was "subject to the completion of financing arrangements," and that the company could not "provide any assurance that the financing arrangements [would] be completed in the near term."[165]  Similarly, Turbodyne's 1998 Form 10-K, filed April 16, 1999, stated that the volatility of Russia's economy "decrease[d] the likelihood that [TBG] w[ould] obtain the necessary financing in order for the

---

[159]*Id.*, ¶ 167.

[160]*Id.*, ¶ 169.

[161]*Id.*, ¶ 170.

[162]*Id.*, ¶171

[163]*Id.*

[164]*Id.*, ¶ 173

[165]*Id.*, ¶ 174.

1   Company to commence shipments of the Turbopacs™ pursuant to its agreement with [TBG]."[166]

2       Initially, the court notes that plaintiffs have failed to allege facts showing that defendants

3   deliberately or recklessly misrepresented the creation of the Turbodyne Credit Corporation.

4   Nothing in Turbodyne's "corrective" press release or in the company's Form 10-K appears to

5   contradict its statements regarding the creation or the purpose of the credit subsidiary.

6       Additionally, none of the plaintiffs' allegations indicates that defendants knew their

7   statements regarding the TBG sale or its financing were consciously false or deliberately reckless

8   when made.[167]   The complaint contains no allegations respecting the individual defendants'

9   knowledge that the statements were false.   While Turbodyne was directed to issue a "corrective"

10  release, none of the allegations in the complaint gives rise to a strong inference that defendants

11  knew the earlier releases were misleading or that they were deliberately reckless in issuing them.

12  In fact, plaintiffs themselves recognize that Turbodyne's June 1998 release cautioned that the TBG

13  sale was contingent on the successful completion of financing.   The fact that the EASDAQ later

14  determined the press releases were inaccurate does not alone support a strong inference of

15  conscious misconduct or deliberate recklessness.   See *Silicon Graphics, supra*, 183 F.3d at 974.

16  And, even if the releases might be classified as "reckless," mere recklessness, as opposed to a

17  strong inference of deliberate recklessness, does not satisfy the heightened pleading requirements

18  of the PSLRA.   *Id.*   Consequently, with the exceptions noted above, plaintiffs have failed to allege

19  adequately that defendants made false statements regarding the TBG transaction with knowledge

20  or deliberate recklessness.

21             **vi.**    **The Value Of Turbodyne's Technology**

22      Plaintiffs allege that defendants knowingly misrepresented the value of Turbopac's

23  technology on numerous occasions during the class period by publicly claiming that the Turbopac

24  

---

25     [166]*Id.*, ¶ 175.

26     [167]Plaintiffs' allegations regarding World Bank financing of the TBG sale are the only

27  exception to this.   To the extent defendants tied the availability of such credit to Turbodyne's UN affiliation, plaintiffs have adequately pled that the statements were consciously false or

28  deliberately reckless for the reasons set forth in Section II.E.2.b.iii above.

1  was "breakthrough" and "innovative," utilized "advanced technology," and "establishe[d] a new

2  paradigm."[168]  Plaintiffs allege defendants knew these claims were false, because on August 4,

3  1998, securities analyst Asensio & Co. published a research report stating that the Turbopac was

4  "merely a supercharger that is driven by an electric motor instead of a belt."[169]  On August 20,

5  1998, Asensio reported that "Turbodyne possesses no valuable technology . . . .  Its alleged

6  revolutionary product is merely an easy to duplicate and manufacture electric motor driven

7  supercharger . . . ."[170]  Plaintiffs assert that defendants' representations to the contrary were made

8  with scienter because "defendants continued to disseminate [such] representations . . . after

9  publication of the Asensio reports and claimed publicly that those reports were incorrect."[171]

10        Initially, it is unclear that defendants' alleged "misrepresentations" regarding the value of

11  the Turbopac technology provide an independent basis for imposing liability under Rule 10b-5.

12  Unlike statements regarding the Turbopac's performance characteristics  (i.e., "the Turbopac is

13  easy to install"), it is difficult to determine the falsity of a representation that a product is

14  "innovative."  Usually, "[u]nless such statements are used to emphasize and induce reliance upon

15  a material misrepresentation, they alone are not actionable as no reasonable investor would rely

16  on them."  *Plevy, supra*, 38 F.Supp.2d at 827.[172]  Rather, liability for such statements lies in

17  combining them with other, more concrete misrepresentations (i.e., overstating Turbodyne's

18  manufacturing capabilities).

19

---

20      [168]*Id.*, ¶ 90.  These statements can be found in press releases (*id.*, ¶¶ 57, 60), and

21  Turbodyne's 1997 Annual Report (*id.*, ¶¶ 65-66).

22      [169]*Id.*, ¶ 92.

23      [170]*Id.*, ¶ 93.

24      [171]*Id.*, ¶ 91.

25      [172]Plaintiffs assert that these statements were made in conjunction with potentially material

26  misrepresentations on several occasions.  As part of its claim that ease of installation made the

27  Turbopac a practical way to reduce vehicle emissions, for example, Turbodyne allegedly asserted
    that the technology was "breakthrough" and established a "new paradigm" for reducing fuel

28  emissions.  (*Id.*, ¶¶ 65, 66.)

1    Additionally, the fact that Asensio found the Turbopac "easy to duplicate" and "merely a

2    supercharger" does not provide strong circumstantial evidence that defendants' statements to the

3    contrary were consciously false or deliberately reckless.  While presumably defendants were

4    aware of Asensio's reports, this knowledge does not indicate that they were deliberately reckless

5    in labeling the Turbopac "advanced."  First, Asensio's reports were published *after* defendants

6    made many of the statements at issue, a fact that militates against inferring scienter solely on the

7    basis of the analyst's publications.  Second, no facts are pled that support an inference defendants

8    had information available to them suggesting the Turbopac was merely a "supercharger" that was

9    "easy to duplicate."  Thus, while Asensio's reports may support an inference that defendants'

10   statements were false, they do not support a strong inference that defendants knew of the falsity

11   or made the statements with deliberate recklessness.

12   Additionally, plaintiffs' allegations do not differentiate among the individual defendants

13   or provide any basis upon which to infer that any of them made false statements regarding the

14   "value" of the technology knowingly or with deliberate recklessness.  While plaintiffs have

15   adequately pled that Halimi knew the Turbopac did not perform properly, their allegations do not

16   support a similar inference that he knew the Turbopac was not "innovative" or "breakthrough."

17   Certainly, none of plaintiffs' allegations supports an inference that defendants Nowek and Ware

18   knew the Turbopac was not innovative.  Accordingly, plaintiffs have failed to allege facts giving

19   rise to a strong inference of deliberate recklessness or conscious misconduct on the part of any

20   of the defendants as respects statements that the Turbopac utilized innovative, advanced

21   technology.

22

### III. CONCLUSION

24   For the foregoing reasons, defendants' motion to dismiss is granted.  Plaintiffs may file

25   an amended complaint within forty-five (45) days of the date of this order.

26

27   DATED: March 13, 2000

_Margaret M. Morrow_
_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE

47