



# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE TURBODYNE TECHNOLOGIES, INC. SECURITIES LITIGATION, | ) ) ) ) ) ) | CV 99-697 FMC (BQRx)  **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** |

The matter came on for hearing on August 18, 2000. The parties were in possession of the Court's tentative decision. Following oral argument, the Court requested supplemental briefing. The Court has now read and considered the supplemental documents filed by plaintiffs and defendants and renders the following decision:

## I. Introduction

This is a securities fraud class action brought against Turbodyne Technologies, Inc., and three of its officers and directors on behalf of all public investors who purchased Turbodyne securities between March 1, 1997 and January 22, 1999 (the "class period").

Docketed
Copies / NTC Sent
JS - 5 / JS - 6
JS - 2 / JS - 3
CLSD

1

*10 1*

Plaintiffs allege that the defendants violated §§10(b)(5) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") and Rule 10b-5 of the Securities and Exchange Commission ("SEC") regulations promulgated thereunder by making false and misleading statements concerning a variety of issues related to the company's development and expected release of a product known as Turbopac. The Turbopac is an allegedly advanced form of turbocharger for internal combustion engines that uses microchip technology to boost airflow into the engine. The product also allegedly increases the engine's fuel efficiency and reduces emissions.

Procedural History

This case was filed on January 22, 1999. The Court consolidated related actions and appointed lead plaintiffs and counsel on May 28, 1999. On March 15, 2000, this Court issued an order (the "March Order") granting defendants' motion to dismiss plaintiff's complaint. On May 4, 2000, plaintiffs filed a First Amended Consolidated Class Action Complaint ("FAC"). Defendants now move to dismiss the FAC on several grounds: plaintiffs' allegations of scienter fail to meet the Private Securities Litigation Reform Act's (the "Reform Act's") requirements; plaintiffs' allegations fail to demonstrate that defendants' statements were false or misleading when made; defendants' forward-looking statements are not actionable; plaintiffs' allegations of fraud on the market do not plead reliance; and plaintiffs fail to state a claim for control person liability.

Parties' Requests for Judicial Notice

Defendants object to plaintiffs' request for judicial notice of Exhibits G through L

2

attached to the declaration of Thrower.  Defendants raised the same objection to plaintiffs'

request to take judicial notice of Exhibits I through P in the course of the first motion to

dismiss.  As explained in the Court's March Order, the Court need not take judicial notice

of "documents whose contents are alleged in a complaint and whose authenticity no party

questions, but which are not physically attached to the plaintiff's pleading."  *Branch v.*

*Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  The Court will consider the documents in deciding

defendants' motion to dismiss. *See Silicon Graphics, Inc. Securities Litigation*, 183 F.3d

970, 974 (9th Cir. 1999); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.

1996).

Defendants' request for judicial notice of the twenty-two identified documents is

granted.

## II. Standards

A. Federal Rule of Civil Procedure 12(b)(6)

Defendants' motion requires the Court to determine whether plaintiffs' complaint

states claims upon which relief may be granted.  *See* Fed R. Civ. P. 12(b)(6).  The Court will

not dismiss plaintiffs' claims for relief unless they cannot prove any set of facts in support

of their claims that would entitle them him to relief.  *See Steckman v. Hart Brewing, Inc.*,

143 F.3d 1293, 1295 (9th Cir. 1998).  In limiting its inquiry to the content of the complaint,

the Court must take the allegations of material fact as true and construe them in the light

most favorable to the plaintiff. *See Western Reserve Oil & Gas Co. v. New*, 765 F.2d 1428,

1430 (9th Cir. 1985). As noted above, in deciding a motion to dismiss, the Court may

consider "documents whose contents are alleged in a complaint and whose authenticity no

party questions, but which are not physically attached to the plaintiff's pleading." *Branch*,

14 F.3d at 454. Finally, the Court "is not required to accept legal conclusions cast in the

form of factual allegations if those conclusions cannot be reasonably drawn from the facts

alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 755 (9th Cir. 1994).

B. Federal Rule o f Civil Procedure 9(b)

Rule 9(b) states in pertinent part that "the circumstances constituting fraud or mistake

shall be stated with particularity." Fed. R. Civ. P. 9(b). The allegations must be specific

enough "to give defendants notice of the particular misconduct which is alleged to constitute

the fraud charged." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). A complaint

meets this standard if it alleges the time, place and content of the alleged fraudulent

representation or omission. *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1239 (N.D. Cal.

1998). In a securities fraud case, plaintiffs must also allege "why the disputed statement was

untrue or misleading when made." *In Re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541,

1549 (9th Cir. 1994) (en banc). As explained in the Court's order granting defendants'

motion to dismiss: "[t]his requires that the plaintiff allege contemporaneous statements or

information known to the defendants at the time the statement was made that demonstrates

its falsity." (March Order, 22:18-21.)

C. Private Securities Litigation Reform Act

Congress passed the Private Securities Litigation Reform Act (the "Reform Act") in

4

1995. The Reform Act amended the Securities Exchange Act of 1934 and modified Rule 9(b)'s particularity requirement for securities fraud cases. The Reform Act requires a securities fraud complaint to identify "(1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." *In re Silicon Graphics Inc., Securities Litigation,* 183 F.3d 970, 996 (9th Cir. 1999).

### III. Allegations of False or Misleading Statements

Defendants contend that plaintiffs' allegations of scienter do not meet the Reform Act's heightened pleading standards. In addition, defendants argue that plaintiffs' allegations fail to demonstrate that any of the statements attributed to defendants were false or misleading when made. Finally, defendants contend that their forward-looking statements are not actionable pursuant to the Reform Act's safe harbor and the bespeaks caution doctrine. The Court will address each of defendants arguments as they relate to the categories of allegedly false statements set out below.

As an initial matter, the Court notes that in resolving defendants' first motion to dismiss, the Court found that the original complaint sufficiently alleged scienter for the following defendants with respect to the following misrepresentations: Turbodyne and Halimi for the performance capabilities, (March Order 34:15-17); Halimi, Nowek and Turbodyne for Singleton's involvement in the financial affairs of the company, (*id.* at 36:13-15); Halimi and Turbodyne for the UN endorsement, (*id.* at 39:22-23); and all defendants

5

for manufacturing capabilities, (*id.* at 41:25-42:1, 42:9-11).   Contrary to defendants'
assertion, these findings were not dicta. (Defendants' Reply 4:23.)   In resolving defendants'
second motion to dismiss, the Court will not disturb the Court's previous findings that the
allegations of scienter were sufficient.

Plaintiffs' FAC alleges four categories of allegedly false statements or
misrepresentations: performance capabilities; manufacturing capabilities; UN Flag
Technology Status; and Singleton's involvement in the financial affairs of the company.   To
satisfy the pleading requirements of the Reform Act plaintiffs must identify: "(1) each
statement alleged to have been misleading; (2) the reason or reasons why the statement is
misleading; and (3) all of the facts on which the belief is formed."   *Silicon Graphics*, 183
F.3d at 996.   In other words, plaintiffs must "set forth an explanation as to why the
statement or omission complained of was false or misleading."   *Yourish v. California
Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999).   This falsity requirement can be satisfied by
pointing to "inconsistent contemporaneous statements or information made by or available
to the defendants."   *Id.*; *see also In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir.
1994).

A. Turbopac's Performance Capabilities

The allegations of false or misleading statements with respect to the Turbopac's
performance capabilities fall into six categories: (1) the Turbopac did not operate
continuously; (2) the Turbopac required expert installation and thus was not "easy to install"
as represented; (3) the Turbopac delivered less boost than represented; (4) the Turbopac

6

could not operate in 8.0 liter engines; instead it only operated in engines up to 2.0 liters of displacement; (5) the Turbopac contained design flaws that caused units to short out and burn and to drain batteries while not in use.

1. Continuous Operation

Plaintiffs allege that the statement that the Turbopac "runs continuously" in the Form 6-K filed by Turbodyne on September 12, 1997, was false. Plaintiffs point to Grand's trial brief in support of this allegation. The trial brief recounts defendant Halimi's testimony that the Turbopac was never designed to operate continuously and that it was equipped with a 5-second governor that precluded continuous operation. (FAC ¶ 75.) Grand's closing brief cited the testimony of a Turbodyne engineer that the Turbopac was deliberately designed to automatically shut off after eight seconds. (*Id.* at ¶ 76.) As the Court found in its March Order, these allegation sufficiently allege scienter as to Halimi and Turbodyne. The Court finds that allegations are sufficient that the statement in September, 1997, that the Turbopac "runs continuously" was false or misleading because Halimi knew the Turbopac would only run for five or eight seconds.

2. Installation

Plaintiff alleges that the statements the "Turbopac can be installed without the need for precision machining," "installation is simple" and "No internal engine modifications are required. . . . The Turbopac . . . is 'user friendly' and *easy* to *install*" are false or misleading. (FAC ¶¶ 54, 67, 69.) These statements were found in Turbodyne's Form 6-K filed September 12, 1997, Turbodyne's 1997 Annual Report and an interview with defendant

7

Ware published in the *Wall Street Transcript* on October 26, 1998.

On two occasions prior to the class period, defendants stated that the "Turbopac can be installed by unskilled mechanics." (FAC ¶ 40, Form 20-F, filed September 18, 1996; *id.* ¶ 45, Form 20-F, filed December 10, 1996.) Defendants are correct that they are not liable for these pre-class period statements. *See In re Quintel Entertainment, Inc Securities Litigation*, 72 F. Supp. 2d 283, 290 (S.D. N.Y. 1999). However, "statements made prior to the Class Period are relevant in determining whether defendants had a duty to make a corrective disclosure during the Class Period." *Id.* at 291. It is well established that a statement of historical fact, even if believed to be true when made, must be corrected within a reasonable time after later discovery of its inaccuracy. *See Stransky v. Cummins Engine Co., Inc.,* 51 F.3d. 1329, 1331-2 (7th Cir. 1995); *In re Burlington Coat Factory Securities Litigation,* 114 F.3d. 1410, 1431 (3rd Cir. 1997).

Defendants' argument that this duty to correct does not apply if the incorrect statement was made outside the class period is unavailing. Precisely the same principles apply. Nor is the statute of repose relevant. The harm is done, not at the time the original statement is made, but during the class period when the company fails to correct it. Nor is it relevant, for purposes of analysis of this issue, that the company stock was not trading in an "efficient market" at the time of the original statements. During the class period, when class members would be likely to investigate the history of the prospective stock acquisition, the stock was trading in an efficient market.

Plaintiffs' allegations that these statements were false or misleading are based on

Grand's Closing Brief recounting Halimi's 1996 testimony that he was aware the product needed electrical upgrades to work properly and fuel system upgrades were required. Halimi also testified that the Turbopac could only be installed by an expert, and that he, the inventor and mechanical engineer, could not install the Turbopac. The arbitration award found that "the statements that it [the Turbopac] was easy to install and could be sold to the ultimate consumer were contrary to later statements that it should be sold through car shops where expertise would be available to ensure proper installation." The arbitrator concluded that "a chip would have to be designed for every engine and produced and shipped along with the Turbopac."[1]

Defendants contend that these statements are not false because the Turbopac is easy to install "when compared to prior turbocharger technology." (Def. Memo. 20:8.) However, none of defendants' statements compare Turbopac's "simple installation" to installation of existing turbocharge technology. Defendants also argue that "[i]t is clear from these statements that the installation of a Turbopac unit is not the sort of thing a typical car owner can do easily in the driveway on the weekend." *Id.* at 20:15-16. However, the combination of the phrases "user friendly" and "easy to install" suggests that the end "user," the car owner, could install the Turbopac. Moreover, during the class period, defendants did not correct their pre-class period statements that an "unskilled" mechanic could install the Turbopac. Although "unskilled" is somewhat vague, the clear import is that an expert is not

---

[1] At least by 1998, Turbodyne began providing microchips with Turbodyne units. FAC ¶ 69, Ware interview with *Wall Street Transcript*.

9

necessary. This is contradicted by Halimi's Grand testimony that Turbopac could only be installed by an expert and that he, the inventor and mechanical engineer, could not install the Turbopac.

The Court finds that plaintiffs have sufficiently alleged that defendants statements were false or misleading with respect to whether the Turbopac was easy to install. The Court previously found that Halimi's testimony was sufficient to support scienter on the part of Halimi and Turbodyne with respect to these statements.

3. Boost

Plaintiffs' FAC alleges that defendants made false or misleading statements about the amount of boost the Turbopac would deliver. Plaintiffs cite articles appearing the August and September 1997 issues of *Heavy Duty Trucking* magazine reporting that Turbodyne claimed the Turbopac produced a 4 psi to 5 psi boost almost instantaneously. (FAC ¶ 61.) Plaintiffs also allege that defendants made similar false or misleading statements in a brochure disseminated publicly by Turbodyne at least as early as April 1997. (FAC ¶ 70.)

Defendants contend that the statements from the magazine and the brochure cannot support plaintiffs' claims for securities fraud because they are not attributable to defendants and they fail to plead fraud with particularity.

Plaintiffs allegation that *Heavy Duty Trucking* published articles which reported "claims by the Company" that Turbopac produces a 4 psi to 5 psi boost does not meet the particularity requirements of Rule 9(b). Although plaintiffs identify the issue of the magazine, statements attributed to the "Company" without identification of the speaker on

10

behalf of the "Company" do not meet the particularity requirements of Rule 9(b). Similarly, plaintiffs allegation that a brochure distributed "by Turbodyne at least as early as April 1997" lacks the requisite specificity. Plaintiffs do not provide the title of the brochure, its topic or publication date. The FAC does not allege who from Turbodyne, whether an individual or department, distributed it. It does not allege who received it — analysts, customers, vendors or others. Although defendants likely are aware of their own publications, these allegations are insufficient to "aver with particularity the circumstances constituting the fraud." *GlenFed, Inc.*, 42 F.3d at 1547.

Plaintiffs allegations of fraud based on the amount of boost do not meet the particularity requirements of Rule 9(b). Plaintiffs' claim based on these allegations is dismissed without prejudice.

## 4. Operation in 8.0 liter engines

Plaintiffs' FAC alleges that defendants' claim that the Turbopac is recommended for engines up to 8 liters of displacement. This allegation is based on the brochure distributed by defendants "at least as early as April 1997." (FAC ¶ 70.) For the reasons stated above, plaintiffs' allegations based on the brochure are insufficient under Rule 9(b). Plaintiffs' claim based on these allegations is dismissed without prejudice.

## 5 Design Problems

Plaintiffs allege that defendants' general statements about the performance of the Turbopac were false or misleading because of design and operational flaws including that the Turbopac would short out and burn and that it would drain batteries while not in use.

11

a. Contract Status

Plaintiffs claim that Turbodyne misrepresented the status of its contract with Grand in paragraphs 51, 52 and 55 with statements made between July and August 1997: "there is a risk that Grand will not be able to complete its [purchase] obligation under the Grand agreement," "distribution and sales of these units in the US has been slowed by further changes in specifications to meet consumer requirements and as requested by Grand Technologies" and "Grand did not meet the minimum purchase requirements." Plaintiffs allegations that these statements were false or misleading are based on the testimony in the Grand proceeding that Turbodyne was not delivering the promised quantities because production lines were not running until the Summer of 1997 and that the units that were delivered contained design flaws. Defendants counter that they disclosed that the lack of significant sales was due to delays in full scale production by Turbodyne. They contend that plaintiffs' allegations are out of context and do not support a finding that the statement was misleading. The Court finds that defendants' statements are literally true: "distribution and sales of these units in the US has been slowed by further changes in specifications to meet consumer requirements" (consumer requirements such as not shorting out). Moreover, whether attributable to Grand or Turbodyne, stock prices are impacted by the end result: failure to complete the terms of the Grand contract. The Court finds that plaintiffs have not sufficiently alleged that defendants' statements were false or misleading or contained material omissions when made.

12

b. Completion of Development

In paragraphs 50, 52 and 54, plaintiffs allege that Turbodyne's statements that it "has completed development and commenced production of the 1500 Turbopac model" and that "[p]roduction of the 1500 Turbopac, which began late last year, continued" were false or misleading because "Turbopac was beset with design and operational problems that rendered the product unable to perform the basic functions represented, unmarketable, and potentially dangerous." (FAC ¶ 53.) Plaintiffs point to testimony in the Grand proceeding that Grand informed defendants of Turbopac's design problems. These allegations that design flaws existed do not contradict Turbodyne's statements that it has commenced "preliminary commercial production," that the "specification and design" are "essentially complete" or that it has "completed development of the 1500 Turbopac model and commenced production." (Privette Dec., Ex. B, 67; Ex. I, 233.) Plaintiffs allegations regarding design and operational flaws are insufficient to allege that the statements about production of the Turbopac were false or misleading.

c. Bus Kits

Plaintiffs allege that Turbodyne's statements in press releases dated January and March 1998 that it was testing its products with the transit authorities in Wisconsin, Maryland and Washington, D.C., and that it had a purchase order from Detroit Diesel Corporation for "bus kits" are false and misleading. Plaintiffs allege that these statements are false and  misleading because the Turbopac was beset with design and operational problems. Defendants contend that these allegations are insufficient to allege falsity because

13

they do not contradict the fact that the tests were taking place or that Turbodyne had received the purchase order. The Court finds that the allegations based on the Grand proceeding cannot support a finding that the statements made in January and March 1998 were false when made.

d. Purchase Orders

Plaintiffs' claims based on allegations that the statements found in the April and May 1998 announcements with respect to purchase orders and joint development agreements fail for the same reason. Allegations of falsity based on the testimony from the Grand proceedings cannot support a finding that statements made after that point were false when made.

e. 1997 Annual Report

Plaintiffs allege that the statements found in defendants 1997 Annual Report are false or misleading:

> Our products reduce pollutant emissions, reduce fuel consumption and increase engine performance. Turbodyne is the only known company to achieve these three benefits simultaneously . . . . Our products are available now, today. Our products are tried, tested and true. They are practical and affordable for the customer and easy to install and implement within the existing infrastructure.
> * * *
> Turbodyne has combined advanced technology of the miniaturization of power electronics, with centrifugal compressor aerodynamics and microprocessors, to create products that provide internal combustion engines with additional air for clean, non-polluting engine power from cold start-up until peak torque.

(FAC ¶ 66, citing 1997 Annual Report.)

Plaintiffs allegations of falsity are based on the Grand proceeding testimony that the

14

Turbopac had several design flaws including a tendency to short out, burn up and to drain batteries. In general, statements such as "tried, tested and true" are considered corporate puffing and are not actionable. *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998). Moreover, reference to "our products," even juxtaposed with a photograph of the Turbopac, is too vague to support liability for making false statements about the Turbopac. Plaintiffs' allegations of false or misleading statements based on the 1997 Annual Report are dismissed without prejudice.

6. Other Statements

In paragraph 48, plaintiffs allege that defendants statements that the Turbopac successfully met the air quality standards mandated by EPA and that it had a unique capability to reduce diesel engine emissions were false. However, plaintiffs make no allegations that the Turbopac did not reduce emissions or pass the tests. Instead, plaintiffs allege that because the Turbopac was "beset with design and operational problems" these statements are misleading or incomplete. This allegation does not demonstrate that defendants' statements with respect to EPA test or emissions were false or misleading.

Plaintiffs also allege that the statements in the January 20, 1998, press release concerning testing of the Turbopac by the Washington D.C. Metropolitan Area Transit Authority were false. However, statements such as "already proven . . . engine performance capabilities" and a "breakthrough technology" are not actionable. These statements are corporate puffing and are not actionable. *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998). Absent other, concrete misrepresentations, these statements are not

actionable. *See Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989).

In sum, plaintiffs have adequate alleged a claim for securities fraud against Halimi and Turbodyne based on: (1) statements that the Turbopac would run continuously; and (2) statements that the Turbopac was easy to install.

B. Turbodyne's Manufacturing Capabilities

Plaintiffs allege that defendants made several false or misleading statements about their manufacturing capabilities. Plaintiffs' allegations of falsity are based on the Grand arbitration proceedings. Those proceedings indicate that Turbodyne did not have an assembly line to produce the Turbopac until Spring of 1997. The arbitrator found that "the only units that were shown to operate properly were those [handmade prototypes] made before the production line was put in operation. None of the production models were shown to operate properly, and some of the handmade units failed." (FAC ¶ 117.) In addition, as observed in the Court's March Order, allegations based on Singleton's complaint "demonstrate that Turbodyne did not have substantial manufacturing capacity at any point between 1996 and mid-1998." March Order 41:1-2.

As noted above, although plaintiffs' allegations based on pre-class period statement cannot form the basis for liability *(See In re Quintel*, 72 F. Supp. 2d at 290), "statements made prior to the Class Period are relevant in determining whether defendants had a duty to make a corrective disclosure during the Class Period." *Id.* at 291. Prior to the class period, Halimi represented to shareholders that Turbodyne had the capacity to produce 8,000 Turbopacs per month.

16

Class period statements include the statement in Turbodyne's Form 6-K filed July 22, 1997, that "[p]roduction of the 1500 Turbopac TM, which began late last year, *continues*." (FAC ¶ 100.) (emphasis in complaint.)  This statement clearly represents that Turbodyne was producing the 1500 Turbopac in late 1996.  This statement is contradicted by plaintiffs' allegations that Turbodyne did not have capability to produce the Turbopac until Spring 1997.

On December 4, 1997, Turbodyne filed a Form 6-K which stated that "the addition of Mr. Walter Ware . . . is positively affecting the Company's . . . ability to produce large quantities of product on time to meet the demand of our customers."  (*Id.* ¶ 102.)  Instead of a forward-looking statement about expectations based on Ware's addition to the company, this statement represents that Turbodyne has the ability to produce large quantities of product on time.  This statement is contradicted by allegations based on Singleton's complaint and the Grand proceedings that Turbodyne did not have substantial manufacturing capacity between 1996 and mid 1998.  These allegations adequately support plaintiffs' claims against Halimi, Ware and Turbodyne for securities fraud with respect to some statements regarding Turbodyne's production capacity.  However, as explained below several other allegedly false or misleading statements fail to state a claim for securities fraud.

In the Form 6-K filed on September 12, 1997, defendants' stated that "Turbodyne has completed development of the 1500 Turbopac and has commenced production."  (*Id.* ¶ 101; Privette Dec., Ex. I 233.)  Plaintiffs' acknowledge that the statement disclosed that delays in full scale production had occurred.  However they contend that Turbodyne "downplayed

17

those delays as involving warranties and instruction manuals, not the Turbopac product itself." (*Id.* ¶ 101.) The filing does not state that the delay in full scale production was attributable to the warranties and instruction manuals. Instead, in an inartful, compound sentence, the filing states that full scale production is anticipated to begin shortly and that warranties and manuals are being finalized. This filing cannot support plaintiffs' claim for securities fraud.

Defendants issued a news release on March 30, 1998, announcing that it had signed an exclusive distribution agreement with Asoria International for 1,000 Turbopacs in the first year. (*Id.* ¶ 103) This statement is not contradicted by plaintiffs' allegations that Turbodyne did not have manufacturing capacity until mid-1998 because they contradict neither the existence of the contracts nor Turbodyne's ability to meet them. The year-long contract gave Turbodyne until March of 1999 to deliver the 1,000 Turbopacs. The allegations that Turbodyne did not have substantial manufacturing capability in mid-1998 does not implicate its ability to produce that quantity after mid-1998. Similarly, statements made in press releases on April 29, May 26, June 22 and July 2, 1998, do not support a claim for securities fraud based on plaintiffs' allegations because they are based on future orders not implicated by Turbodyne's lack of production capacity between 1996 and mid-1998. (*Id.* ¶¶ 105, 107, 110.)

Defendants' S-1 registration statement filed September 23, 1998, that it had commenced commercial production of the 1500 model is not contradicted by plaintiffs' allegations that Turbodyne did not have substantial production capacity between 1996 and

18

mid-1998. (*Id.* ¶ 113.)

Plaintiffs allegations in paragraph 109 fail for two reasons. First, plaintiffs do not sufficiently allege that the statements made in the Standard & Poor's report are attributable to defendants. Second, the statement "improving its production expertise . . ." is not contradicted by the allegations that Turbodyne did not have substantial production capacity. The second reason also applies to paragraph 112 which alleges that the statement "the 1998 fiscal year remains strong for the company as we *roll-out* our new breakthrough technology on a *global scale*." (*Id.* ¶ 112) (emphasis in FAC.)

C. UN Flag Technology Status

Plaintiffs' complaint alleges that defendants made false and misleading statements by stating that they had received "UN Flag Technology" designation. In an April 11, 1997, press release, defendants stated that the Turbopac had been recognized by the United Nations Development Program and had been awarded UN Flag Technology status. (FAC ¶ 124.) Turbodyne repeatedly touted their UN Flag Technology status and in several releases that stated the designation resulted in purchasers being able to obtain financing from international organizations. (*Id.* ¶¶ 129-30.)

On August 19, 1998, Francois Lorio, of the United Nations Development Program sent a letter which stated that the "UNDP does not certify or endorse any companies or products on behalf of the United Nations or any associated UN agencies. Press releases concerning 'UN Flag Technology' endorsement or status were not authorized by UNDP and

19

in no way represent our institutional position with regard to these technologies or related financing." (*Id.* ¶ 135.) Despite this letter, Turbodyne stated in an August 21, 1998, press release that it had received UN Flag technology status and refuted reports to the contrary. (*Id.* ¶ 136.) Defendants did not remove their previously issued press releases and announcements touting their UN Flag Technology status from their website.

The Court finds that plaintiffs have adequately identified defendants' false statements with respect to their designation as Flag Technology status to state a claim for securities fraud against Halimi and Turbodyne.

D. Singleton's Involvement

Plaintiffs allege that defendants misrepresented John Singleton's involvement in the financial affairs of the company. Singleton was appointed CFO in February of 1998. Turbodyne's press releases dated February 26, and March 16, 1998, stated that Singleton was highly regarded in the international financial community and that he would "oversee finance and treasury, administration, contracts, legal, information systems, investor relations and human resources." (*Id.* ¶ 142.) On May 14, 1998, defendants issued a news release reporting the company's fiscal results for the year ending December 31, 1997. The release contained quotes from Singleton with respect to financial matters. (*Id.* ¶ 143.) On May 22, and June 1998, Turbodyne reported financial information and cited Singleton as the source. (*Id.* ¶¶ 145, 146.)

Plaintiffs' complaint alleges that these statements are false or misleading because Singleton was denied access to the company's financial information and had no part in

relaying the financial information contained in the press releases. (*Id.* ¶ 149.) These allegations are based on Singleton's complaint filed in lawsuit against Turbodyne. (*Id.* ¶ 151-56.) Defendants argue that these statements cannot support a claim for securities fraud because the financial statements were accurate whether or not Singleton had anything to do with them.

The Court finds that, based on Singleton's reputation, incorrectly attributing the financial statements to him was misleading. Plaintiffs' complaint sufficiently states a claim for securities fraud against Halimi, Nowek and Turbodyne based on these allegations.

E. Bespeaks Caution Doctrine

Defendants contend that their forward looking statements are not actionable under the "bespeaks caution" doctrine.[2] This doctrine insulates defendants from liability where defendants' forward-looking representations carry sufficient cautionary language or risk disclosure so that the Court can determine as a matter of law that the statements were not misleading. *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996); *Fecht v. Price Co.*, 70 F.3d 1078, 1082 (9th Cir. 1995). "However, inclusion of some cautionary language is not enough to support a determination as a matter of law that defendants' statements were not misleading." *In re Stac*, 89 F.3d at 1408. "A motion to dismiss for failure to state a claim will succeed only when the statements containing defendants'

---

[2] As explained in Part III.B., plaintiffs have failed to adequately allege that defendants statements in the March 30, May 26 and June 22, 1998, news releases were false or misleading.

21

challenged documents include 'enough cautionary language or risk disclosure' . . . that 'reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht*, 70 F.3d at 1082 (citation and quotations omitted).  However, where risk disclosures are "generalized in nature," a reasonable jury could find the statements misleading, and defendants' cautionary language does not bar plaintiffs' claims as a matter of law.  *See Gray v. First Winthrop Corp.*, 82 F.3d 877, 884 (9th Cir. 1996).

On July 22, 1997, Turbodyne filed a Form 6-K which included an announcement about its UN Flag status.  (FAC¶ 127.)  Turbodyne's 1997 Annual Report similarly touted its UN Flag status.  (FAC ¶ 130.)  Defendants contend that these are forward-looking statements about potential future sales to which no liability attaches.  Because a reasonable jury could conclude that these statements were misleading, the Court cannot conclude that the statements do not support liability under the bespeaks caution doctrine.

## IV.  Allegations of Fraud on the Market

Defendants argue that plaintiffs' FAC must be dismissed because it does not plead reliance sufficiently.  "It is settled a plaintiff asserting a claim under Rule 10b-5 can satisfy the reliance element by asserting, in appropriate cases, the fraud on the market theory rather than alleging direct reliance."  *Cammer v. Bloom*, 711 F. Supp. 1264, 1275 (D. N.J. 1989) citing *Basic v. Levinson*, 485 U.S. 224 (1988).

> The fraud-on-the-market presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .

Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements."

*Binder v. Gillespie*, 184 F.3d 1059, 1064 (1999), quoting *Basic*, 485 U.S. at 241-42. Plaintiffs are entitled to a presumption of reliance where they allege that the security in question is traded in an efficient market — "'one that obtains material information about a company and accurately reflects that information in the price of the stock.'" *See Binder*, 184 F.3d at 1065 quoting *Hurley v. FDIC*, 719 F. Supp. 27, 33 (D. Mass. 1989). In *Binder* the Ninth Circuit applied the five factors set out by Cammer to determine whether a market is efficient: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC registration form S-3; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *See Binder*, 184 F.3d at 1065 quoting *Cammer* 711 F. Supp. at 1286-87.

In the March Order, the Court found that plaintiffs had sufficiently alleged the second and fifth factors — whether securities analysts follow and report on the stock and empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. (March Order at 28:6-9.)

The FAC alleges that Turbodyne stock traded at a high weekly volume: over two million shares per week on average. (FAC 175.) Daily averages exceeded 500,000 shares. (*Id.*) Turbodyne's weekly average of shares traded consisted of approximately five percent

23

of its outstanding shares.  (Plaintiffs' Opp. at 24 n. 31; FAC ¶¶ 3, 175.)  As observed by the *Cammer* court, "'[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one.'"  *Cammer*, at 1286 quoting BROMBERG & LOWENFELS' 4 SECURITIES FRAUD AND COMMODITIES FRAUD, §8.6 (Aug. 1988).  The Court finds that plaintiffs have adequately alleged a high trading volume.

Plaintiffs' FAC also identifies forty-three market makers for Turbodyne stock. (FAC¶ 177.)  Defendant contends that these allegations are insufficient without allegations of the volume of shares that each market maker committed to trade.  (See Defendants' Memo. At 33:23-24, quoting *Griffin v. GK Intelligent Systems, Inc.*, Fed. Sec. L. Rep. (C.C.H.) ¶ 90,958 at 94m184 (S.D. Tex. Feb. 16, 2000)).  The Court finds that the existence of forty-three market makers, in combination with the high trading volume, is sufficient to support a finding that the market for Turbodyne's stock was efficient.

Finally, plaintiffs' FAC alleges that "other than due to certain timing factors, Turbodyne was otherwise thus eligible to file a Form S-3 Registration Statement." (FAC ¶ 179).  The filing of a Form S-3 is relevant to the efficient market analysis because of the minimum stock requirement for filing the Form.  Although defendants dispute the relevance of the fact that the plaintiffs' inability to file a Form S-3 was based on timing, the *Cammer* court explicitly pointed out that if defendants' ineligibility to file a Form F-3 "was only because of timing factors rather than because the minimum stock requirements" were not met, then the Court may find the existence of an efficient market.  *Cammer*, 711 F. Supp. at

24

1287. "[I]t is the number of shares traded and the value of shares outstanding that involve facts which imply efficiency." *Id.* Plaintiff's allegation that, absent timing factors, Turbodyne was eligible to file a Form S-3 based on its common equity in excess of $299 million is sufficient to support a finding of an efficient market.

The Court finds that plaintiffs have alleged sufficient facts to support each of the five factors relevant to an efficient market. Plaintiffs are thus entitled to a fraud on the market presumption of reliance. *See Basic*, 485 U.S. at 250; *Binder*, 184 F.3d at 1064.

## V. Control Person Liability

Defendants contend that plaintiffs allegations are insufficient to support liability of the individual defendants.

To state a claim for control person liability, plaintiffs must show that the primary violation was committed and that defendants directly or indirectly controlled the person or entity committing the violation. *See Paracor Finance Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) (en banc). It is clear that defendants' status as officers and directors is insufficient to create a presumption of control. *See Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396-97 (9th Cir. 1993). Instead, plaintiffs must allege both that the individual defendants "had the power to control or influence" Turbodyne and that they "actual[ly] participat[ed] in activities which are claimed to violate the securities laws." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1441-1442 (9th Cir. 1987).

Plaintiffs allege that: "The individual defendants had the power and the influence and

25

exercised the same to cause Turbodyne to engage in the illegal conduct and practices complained of herein by causing the Company to disseminate the false and misleading information referred to above." (FAC ¶ 193.)

Plaintiffs allegations meet both prongs of the control test set out in *Wool*. Plaintiffs allege that defendants had the power and influence to control Turbodyne. In addition, plaintiffs alleged that defendants exercised that power and influence to cause Turbodyne to disseminate false and misleading information. *See Wool*, 818 F.2d at 1442 ("in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the corporate officers").

Plaintiffs have adequately alleged control person liability.


## VI. Conclusion

Defendants' motion, filed June 19, 2000, is granted in part and denied in part.

Plaintiffs have adequately alleged that defendants made false or misleading statements or material omissions that were false or misleading when made with respect to the following: the Turbopac's ability to run continuously, the ease of installation, Turbodyne's manufacturing capacity, Turbopac's UN Flag Technology status and Singleton's involvement in the financial affairs of Turbodyne. As identified above, several of plaintiffs' allegations fail to meet the pleading standards of the Reform Act.

26

Plaintiffs adequately allege an efficient market for Turbodyne stock and are thus entitled to a presumption of reliance as part of their fraud on the market theory. Finally, plaintiffs' FAC adequately alleges control person liability.

Plaintiffs shall file a Second Amended Complaint within sixty days of the date of this order. Plaintiffs must either remove the allegations identified above as insufficient to support their claims, or should they attempt to make one final effort to reassert those allegations, provide sufficient additional allegations to meet the requirement of Rule 9(b) and the Reform Act.

Dated: September 21, 2000.

FLORENCE-MARIE COOPER, Judge
United States District Court

27